No. 35,398

W. E. REEVES, H. K. LINDSLEY and LEE J. HOBBS, *Appellees*, v. WALTER MORRIS, W. L. MORRIS, WALTER MORRIS and W. L. MORRIS, doing business as WALTER MORRIS AND SON, et al., *Appellants.*

(124 P. 2d 488)

Opinion filed April 11, 1942.

*Fred Hinkle,* of Wichita, argued the cause for the appellants.

*W. D. Jochems,* of Wichita, argued the cause, and *J. Wirth Sargent, Emmet A. Blaes* and *Roetzel Jochems,* all of Wichita, were on the briefs for the appellees.

The opinion of the court was delivered by

ALLEN, J.: This was an action to enjoin the threatened violation of certain restrictive agreements forbidding the erection of any buildings except single family residences in Lincoln Heights, an addition to the city of Wichita.

The appellants platted a large tract of land adjoining the city of Wichita. For a period of years beginning early in 1927 to about January, 1941, they followed a general plan of development and adhered to uniform restrictions which they established and under which the entire addition, with the exception of two blocks, had been advertised, sold and developed as a highly restricted residential district, limited to single-family, two-story homes of specified minimum cost. After more than five-sixths of the entire addition had been sold and developed in conformity with such plan and restrictions over the period, the appellants for the first time, on January 9, 1941, attempted to sell some of the lots to which the foregoing plan and restrictions had theretofore applied, to be used for the purpose of erecting thereon a church building. This use was in conflict with and contrary to the general plan of development and restrictions theretofore observed throughout the addition. Plaintiffs, who owned property lying within the addition and near by the lots which defendants seek to sell for church purposes, brought this action to enjoin the appellants from completing the sale to the church. The injunction was granted by the trial court and appellants seek to have that judgment reversed here.

The court made findings of fact and returned conclusions of law. We quote portions of the findings:

"1. On August 3, 1926, Walter Morris purchased a tract of ground containing seventy-three acres for a consideration of $110,000, or at a price of $1,506.85 per acre.

"2. This tract of ground was platted on the 5th day of February, 1927, and the tract was laid out into a total of fourteen blocks. Blocks 3 and 14 are platted as commercial sites and other blocks as residential sites with a building set-back. The twelve blocks contain a total of 239 lots. The streets vary in width from fifty feet to eighty feet. Eleven little parks or beauty spots are found in the streets. The widest street is Pershing avenue, which is eighty feet. The addition, on the crest of College Hill, extends from Douglas avenue on the north to Kellogg street on the south, contains seventy-three acres more or less, and is known as Lincoln Heights addition to the city of Wichita.

"3. After the property had been platted the defendants began an adver-

tising compaign with the purpose of inducing the general public to buy lots and to build elegant homes. Evidence of some of the things done in this advertising campaign is shown in plaintiffs' exhibit 23 and in brochure exhibit 20.

"4. Advertisements in Wichita newspapers referred to the addition in flattering terms, among which were: 'a super-residential center—a super-shopping and home-owning center.' Throughout the advertising the home interest, the playgrounds, parks, winding drives, and bubbling fountains were referred to. Some advertisements referred to it as 'a residential section of unique and exclusive homes.' Some advertisements referred to it as 'the most exclusive and highly restricted subdivision on College Hill.' Some advertisements asked: 'How much is it worth to live among congenial neighbors? How much is it worth to have a restricted community surrounding you?;' referred to 'exclusive two-story residential homes;' stated, 'It is, and will continue to be, permanent and enduring.' In May, 1928, the plat of the entire addition was shown in the Wichita *Eagle*.

"5. In the brochure, exhibit 20, appears a plat of the addition. There are penciled notations on this plat showing the prices of different lots and showing that the houses in the first block on South Pershing are to cost $18,000, and in the next two blocks $15,000 each. In block 5, facing on Oliver street, the restriction is $6,500. The plat is referred to as a—

"'Plat of the finest residential district in Kansas. The area and frontage of each lot, the curve of boulevards, position of park areas, building set back, combined with carefully analyzed restrictions insures to each home owner the greatest value increment possible. The best business men are choosing this development for their home environments.'

There is a reference to 'all two-story homes' and again to 'exclusive two-story homes.' The defendants state that they 'contemplate the expenditure by them alone of five hundred thousand dollars for homes in Lincoln Heights.' Blocks 3 and 14 are indicated to be commercial.

"6. Twenty-six homes were built by Walter Morris & Son and sold to different purchasers and conveyed without the deeds containing any restrictions. See exhibits 1 and 4. The defendant Will Morris stated to inquirers and prospective purchasers that these houses were all two-story houses and complied with the restrictions contained in the deeds; that Walter Morris & Son intended to place such restrictions in deeds of adjoining property when sold and improved, and therefore it was not necessary to place statements of restrictions in the deeds to properties improved by defendants.

"7. As seen from the contracts of sale, exhibits 9 and 22, and the recitals in the deeds themselves, the general nature of the restrictions in all residential lots throughout the addition is as follows:

"(A) The property is to be improved for no other than one single-family two-story residence.

"(B) A price restriction as to cost of house to be built depending upon the location of the lots in the addition.

"(C) No garage, out-building, or temporary buildings to be used on the premises as a residence pending the time of erecting the dwelling.

"(D) Restricting conveyance by grantee to white persons only.

"(E) No used, second-hand, or previously constructed house or building to be moved or placed as a whole or in sections upon the lot.

"(F) The plans, set-back, elevations, and grades, to be approved by defendant, Walter Morris.

"(G) Violations of the restrictions to be restrained, enjoined, and prevented by the grantor, his heirs or assigns by any legal or equitable remedy.

"(H) Restrictions to cover a period of twenty years from date of conveyance.

"8. In the sale of the lots a printed form of contract was used (exhibit 9), which contained the restrictions which later appeared in the deed (exhibit 1). Salesmen acting as agents for defendants in selling lots, defendant Will Morris, and different builders of the said Walter Morris & Son, represented to purchasers and prospective purchasers that Lincoln Heights was being developed as a unit; that the houses to be built on the property were to be two-story houses, of new construction; that no garages were to be used as residences pending the completion of the house itself; that the conveyances were to be made to people of the white race only; that there was a cost restriction on the houses, the amount of the cost restriction depending upon the location of the house; it was represented that the restrictions would last for a period of twenty years. In selling houses which were built by the defendants, Walter Morris & Son, no restrictions were contained in the deeds for the reason that the houses as built complied with the restrictions to be put upon the adjoining property. It was represented by the defendants Walter Morris & Son to prospective purchasers and purchasers that when sales of lots were later made, the same restrictions would be in the deeds of all other succeeding purchasers in the addition as were contained in the respective deeds delivered to the purchasers. It was represented by them that there was a general plan of improvement of the whole addition that would be followed out by them in successive sales. The purchasers bought their property in reliance upon these statements and representations. In none of the conversations with purchasers and prospective purchasers was it ever represented or stated by the defendants, their salesmen, and builders, that a church might be built upon any part of Lincoln Heights. The statements aforesaid and the advertisements aforesaid were to the effect that nothing would be built in Lincoln Heights Addition but two-story, single-family residence buildings with specifications meeting the approval of the said Walter Morris & Son and their general plan of improvement.

"9. The general plan of improvement of Lincoln Heights by the defendants, Walter Morris & Son, has been that the property was to be conveyed by deeds containing the restrictions set out in paragraph 7, unless the property was improved by the defendants in a manner to meet the restrictions, in which event the property was conveyed without the restrictions being in the deed. The general plan contemplated that the property was to be developed in accordance with the advertising campaign conducted by the defendants (paragraphs 4 and 5) and in accordance with the representations made by the defendants Walter Morris & Son, and their salesmen and builders. (Paragraph 8.)

"10. The public obtained knowledge of the foregoing general plan of development as the result of defendants' advertising and the statements of the

defendants, Walter Morris & Son, their salesmen and builders. That there was a general plan of development could be and was inferred by the general public by observing Lincoln Heights addition itself as developed and by observing the buildings, the parkways, and the printed sign located upon Lincoln Heights.

"11. Lots in Lincoln Heights on Oliver street sold for $10 a front foot, while property across the street on the east side of Oliver which was not in a restricted addition sold for $5 a front foot. In an unrestricted area just north of Douglas avenue, across the street from block 2 in Lincoln Heights addition, lots could be bought for one-half the price defendants were selling lots in blocks 1 and 2 in Lincoln Heights addition. The value of the property in Lincoln Heights was increased because of the restrictions and the general plan of development, and the defendants realized more for their lots by reason of the general plan of development than they would have if they sold them without restrictions. Purchasers of lots in Lincoln Heights paid substantial amounts for their lots.

"16. No written restrictions of any kind or character were included in the recorded plat of Lincoln Heights addition, and no general written restrictions were ever made and recorded concerning Lincoln Heights addition by the defendants Walter Morris & Son or their authorized agents separate and apart from the contracts and deeds which convey the separate lots to their respective purchasers hereinbefore mentioned."

On January 9, 1941, the defendants Walter Morris & Son agreed to sell and convey to the Grace Presbyterian church certain lots in block 2, in Lincoln Heights.

In the deed from Morris to the plaintiff Hobbs conveying lot 4, block 1, in Lincoln Heights, the restrictions were not as extensive as stated in finding No. 7 above quoted. The testimony disclosed, however, that Hobbs was required to submit his building plans before he purchased the lot. He was virtually in the same situation as the purchasers described in finding No. 6.

The plaintiff Lindsley acquired title to certain lots in block 2, Lincoln Heights, from Throckmorton, who had received title under a deed from Morris. The plaintiff Reeves acquired title to lot 13, block 2, in Lincoln Heights, from Friedson, who had received title under a deed from Morris. The deeds from Morris to Throckmorton and Friedson contained restrictions substantially the same as mentioned in finding No. 7 above quoted.

The trial court returned conclusions of law as follows:

"1. In view of the foregoing facts, the court finds that there was and is a reciprocal negative easement in favor of plaintiffs and against defendants, arising by implication in equity, inhering in the title for a period of twenty years, barring the defendants Walter Morris & Son from carrying out their present contract with the Grace Presbyterian church, and barring the defendants

from selling said property to the Grace Presbyterian church without incorporating in the deed the restrictive covenants found in previous deeds when like property was conveyed.

"2. The holding out to the general public of the whole addition as represented in the findings as an exclusive residential district for homes only inheres in the land for the period of the restriction.

"3. The statute of frauds invoked by defendants Walter Morris & Son does not apply in this case, for the well-known doctrine is that the statute of frauds itself cannot be held to perpetrate a fraud.

"4. Injunction should issue in favor of plaintiffs and against defendants as prayed for."

On this appeal defendants contend that under the judgment of the trial court the plaintiffs hold an easement in the land of defendants; that an easement is an interest in land; that under the statute of frauds a contract for sale of lands or any interest therein is void unless the agreement is in writing. It is also contended that the alleged restrictions in the deeds given by defendants were merely conditions subsequent and were therefore enforceable only by defendants "personally or their assigns." It further urged that the erection of a church within the restricted area would not be a violation of the restrictions.

Restrictive covenants have long been recognized in this state. (*Hartman v. Wolverton,* 126 Kan. 613, 270 Pac. 584; *Clark v. Vaughan,* 131 Kan. 438, 292 Pac. 783; *Welsh v. Flo,* 146 Kan. 807, 73 P. 2d 1084; *N. P. Dodge Corp. v. Calderwood,* 151 Kan. 978, 101 P. 2d 883.)

These restrictions or equitable servitudes are based on the equitable principle of notice—that the person who takes land with notice of a restriction upon it will not in equity and good conscience be permitted to act in violation of these restrictions. (2 Tiffany, Real Property, 2d ed., 1425 *et seq.,* §§ 394-401; Clark, Covenants and Interests Running with Land, p. 148.)

The doctrine was stated in the leading case of *Tulk v. Moxhay* (1848), 2 Ph. 774, 41 Eng. Reprint, 1143:

"That this court has jurisdiction to enforce a contract between the owner of land and his neighbour purchasing a part of it, that the latter shall either use or abstain from using the land purchased in a particular way, is what I never knew disputed. Here there is no question about the contract: the owner of certain houses in the square sells the land adjoining, with a covenant from the purchaser not to use it for any other purpose than as a square garden. And it is now contended, not that the vendee could violate that contract, but that he might sell the piece of land, and that the purchaser from him may violate it without this court having any power to interfere. If that were so, it

would be impossible for an owner of land to sell part of it without incurring the risk of rendering what he retains worthless. It is said that, the covenant being one which does not run with the land, this court cannot enforce it; but the question is, not whether the covenant runs with the land, but whether a party shall be permitted to use the land in a manner inconsistent with the contract entered into by his vendor, and with notice of which he purchased. Of course, the price would be affected by the covenant, and nothing could be more inequitable than that the original purchaser should be able to sell the property the next day for a greater price, in consideration of the assignee being allowed to escape from the liability which he had himself undertaken.

"That the question does not depend upon whether the covenant runs with the land is evident from this, that if there was a mere agreement and no covenant, this court would enforce it against a party purchasing with notice of it; for if an equity is attached to the property by the owner, no one purchasing with notice of that equity can stand in a different situation from the party from whom he purchased. . . ." (p. 777.)

In 4 Pomeroy's Equity Jurisprudence, 4th ed., § 1696, it is stated:

"Where an owner of a tract of land lays it out in building lots, makes a plan showing a general building scheme, and sells in accordance therewith to various purchasers, inserting restrictions in all the deeds, the intent will be inferred. The purpose of the restrictions is clearly to benefit all the land in the tract and to make an inducement for purchase. Accordingly, one grantee may enjoin a breach by another, or by one who takes with notice. . . ."

In Walsh on Equity, § 100, it is stated:

"Probably the most usual situation involving equitable easements is a real-estate development in which common restrictions are placed upon all the lots or plots into which the development is divided, intended to bind each lot for the benefit of each and all of the others, each individual lot being bound by the restriction in favor of every other lot, and at the same time receiving the benefit of the restrictions as they bind the other lots. . . . The reciprocal implied restrictions, implied from the facts establishing the existence of a common scheme for the mutual advantage of all, and enforced by equity because the parties so intend, are void at law because the formal requirements of conveyances of legal estates in land are lacking. Because the land is bought and paid for on the basis of the existence of these restrictions as easements for the benefit of the lots sold as against the lots retained by the developer, equity enforces them as though they had been created in due form at law, just as equity enforces an equitable mortgage where the loan is made based on an agreement that the property should be security for the loan, though the required formalities of a legal mortgage are absent. . . ."

In *Evans v. Foss*, 194 Mass. 513, 80 N. E. 587 (1907), the doctrine of equitable servitudes is thus stated:

"It is a familiar principle of law . . . that when one makes deeds of different portions of a tract of land, each containing the same restriction upon the lot conveyed, which is imposed as a part of a general plan for the benefit

of the several lots, such a restriction not only imposes a liability upon the grantee of each lot as between him and the grantor, but it gives him a right in the nature of an easement, which will be enforced in equity against the grantee of one of the other lots, although there is no direct, contractual relation between the two. Through the common character of the deeds the grantees are given an interest in a contractual stipulation which is made for their common benefit." (p. 515.)

In *Johnson v. Mt. Baker Park, etc., Church*, 113 Wash. 458, 194 Pac. 536, the action was to enjoin the appellant from erecting a church in a restricted addition to the city of Seattle. As the facts are similar to the case at bar, we quote from the opinion at length. The court stated:

"We have here, then, a case involving the following outstanding facts: The improvement company platted this land and put it on the market with the intention of limiting the use of the various lots to residences only. This intention has been in all respects made public and known to each purchaser, and has been systematically carried out. Conforming to this scheme, some years ago it sold lots to the plaintiffs, and its deeds of conveyance contained building restriction clauses. When more than three-fourths of the lots had been conveyed by similar deeds, it conveyed to appellant the lot in question by deed which did not contain any use restriction, but appellant at the time of purchase had complete notice of the restricted use plan.

"The statute of frauds cannot be involved except where the question of interest or easement in land is involved. We think it must be conceded that in this case the respondents have no interest or easement in appellant's land in the sense of the statute of frauds. There is certainly nothing in the case to show any writing creating such interest or easement, nor is there anything which might be construed as creating or attempting to create such interest or easement, other than the testimony to the effect that, when it made its deeds to respondents, the improvement company represented to them that restriction clauses would be placed in all deeds made by it. But this, being only an oral promise, would be wholly unenforceable as an attempt to create an interest or easement in appellant's land.

"The oral testimony in this case was admissible, not for the purpose of attempting to create an interest or easement in appellant's land, but only for the purpose of assisting in showing the general restricted use program, initiated in the beginning by the improvement company and subsequently carried out. If, therefore, respondents' right to relief must be based on some interest or easement in, or encumbrance upon, appellant's land, they cannot succeed.

"But we are of the opinion that the statute of frauds is not in this case, and that the respondents are entitled to the relief sought by them without having an interest or easement in appellant's lot. Their rights are based solely on equitable principles. It is immaterial whether they have any interest or easement in appellant's property. The point is whether, in good conscience, and by the application of well-known equitable principles, the appellant is estopped to use its property for the purpose of building a church thereupon.

"Here the appellant bought its property with knowledge of all the facts; it knew that the improvement company from the beginning had established and advertised a general plan whereby all of the property in this subdivision should be used for residence purposes only; it knew that the improvement company had agreed with a great many purchasers of lots, that the platted addition would be used only for restricted purposes; it knew that the deeds to nearly all lots which had been sold contained clauses restricting the use of the lots sold. In fact, by the contract which it entered into with the improvement company when it bought its lot, it agreed to protect the improvement company against any damage or expense resultant from deeding to it without restrictions, and therein it expressly agreed that, if it sold its lot before constructing the church, it would insert in its deed the restrictive clause. Notwithstanding all of this knowledge, it now proposes to build its church in direct contradiction to the general development plan known to it. If appellant may, under these circumstances, build a church, so may the owner of another lot build an apartment house, or a flat, or a public garage, or a store building."

See, also, *Sanborn v. McLean*, 233 Mich. 227, 206 N. W. 496; *Rowe v. May*, 44 N. M. 264, 101 P. 2d 391; *De Gray v. Monmouth Beach Clubhouse Co.*, 50 N. J. Eq. 329, 24 Atl. 388; *Adams v. Field*, 297 Pa. 247, 146 Atl. 889.

Defendants contend that the restrictions in the deeds from Morris to the plaintiffs or their predecessors in title created an estate with a condition subsequent enforceable only by Morris or his successors in interest. We are unable to agree with this contention. It was an established rule of the common law that the power to terminate an estate upon a breach of a condition subsequent belonged exclusively to the grantor, and after his death to his heirs. Any attempt to authorize a third person to enforce a forfeiture was void. (Tiffany on Real Property, 2d ed., section 86.) Among the many authorities cited by the author in support of this principle is the case of *McElroy v. Morley*, 40 Kan. 76, 19 Pac. 341, which is relied upon by the defendants. That the rule stated is sound admits of no doubt, but it has no application to equitable servitudes created by the restrictions in the deeds and the general building scheme in this case. (See Tiffany on Real Property, 2d ed., sections 75 to 89, dealing with estates on condition subsequent, and sections 394 to 401 where the author examines the doctrine of restrictions enforceable in equity.)

The judgment of the trial court was supported by the evidence. The addition known as Lincoln Heights was laid out under a general building scheme. Restrictions were inserted in the deeds to the various purchasers and it is clear the restrictions were for the

benefit of all the land in the addition. Lots were purchased, homes were built and large investments were made upon the faith of these restrictions. As the restrictions were for the benefit of all, they were reciprocal in character and could be enforced by the plaintiffs herein. Under these agreements enforceable in equity, the restricted districts in our cities have been developed and the value of the property in such districts depends in a large measure upon their enforcement.

As we find no error in the record, the judgment must be affirmed. It is so ordered.

Hoch, J., not participating.