No. 47,984

SOUTH SHORE HOMES ASSOCIATION, INC., A Corporation, *Appellee,* v. HOLLAND HOLIDAY'S, A Partnership of Lenexa, Kansas, *Appellants.*

(549 P. 2d 1035)

Opinion filed May 8, 1976.

*Gary L. Lane,* of Hackler, Londerholm, Speer, Vader & Austin, of Olathe, argued the cause, and *Wilson E. Speer,* of the same firm, was with him on the brief for the appellants.

*Stephen Jones,* of Coffman, Jones & Hederstedt, of Lyndon, argued the cause, and *Harry T. Coffman,* and *David Hederstedt,* of the same firm, were with him on the brief for the appellee.

The opinion of the court was delivered by

PRAGER, J.: This is an action brought by the developer of a residential area to enforce certain restrictive covenants against the owners of property subject to such restrictions. The plaintiff-appellee is South Shore Homes Association, Inc., the developer of a platted residential subdivision near Lake Pomona in Osage county,

Kansas. The defendants-appellants are Holland Holiday's, a partnership of Lenexa, Kansas, the owners of two lots in the platted area. In the action plaintiff sought injunctive relief to enjoin the defendants from placing mobile homes, campers, or tents upon their real property in the subdivision. After a hearing on the merits the district court issued an injunction permanently restraining the defendants from locating mobile campers and camping tents upon the lots owned by them, or permitting others to do so. The defendants, Holland Holiday's, have appealed to this court.

The facts in this case are not in dispute and were submitted to the court in the form of a stipulation of facts which provided as follows:

"1. South Shore and South Shore Estate are subdivisions in Osage County, Kansas, lying adjacent to Lake Pomona Reservoir. These subdivisions were platted in 1965 and a copy of the plat is attached hereto and made a part hereof by reference. The total number of lots in the South Shore and South Shore Estates Subdivisions is 131 and 202 respectively. Of these totals, houses have been constructed on 21 of the lots in the South Shore Subdivision and 5 houses have been constructed on the lots in the South Shore Estates Subdivision . . .

"2. The real estate located within the Subdivisions is subject to Declarations of Restrictions recorded in Book 'M 1' at page 707 and Book 'M 3' at page 149 of the Register of Deeds office of Osage County, Kansas, and a copy of such restrictions are attached hereto and made a part hereof by reference. The restrictions declare the lots to be described as residential (Section I) with a minimum square footage area of 400 for any residence erected on a lot. (Section IX). No mobile home, house trailer, basement, tent or other outbuilding of a temporary character may be placed or erected on the lots for use or occupancy as a residence, either temporary or permanent. (Section XI).

"3. Landowners are motivated to purchase lots in these subdivisions as real estate investment, for non-urban residences both weekend and year-round and, as in the case of defendants, because of the summer recreational activities available at Lake Pomona. A clear majority of lot owners who have erected houses on their lots reside permanently elsewhere and only maintain their houses as mild weather cottages or weekend retreats. Some facilities normally associated with residential living such as grocery stores, a school and a church are available at nearby Vassar, Kansas. Electrical utilities in the subdivisions are available for all lot owners. Water is available in South Shore through Rural Water District No. 3, Osage County, Kansas, for some residents of South Shore, but a lack of water purification facilities has hampered further expansion of the water district to serve South Shore Estates. A sewer system has not been installed at South Shore Estates. Instead, the houses in the subdivision have individual septic tanks. Permanent asphalt or concrete roads have not been constructed, but gravel roads lead to all of the lots in both subdivisions.

"4. Defendants acquired an interest in Lots 307 and 308 of South Shore Estates Subdivision in 1965 and became record fee owners in July of 1972. Only 5 lots of the total number of 202 on defendants' subdivision (South Shore Estates) have residences erected on them. South Shore is more developed, however, with 21 of a total of 131 of the lots having residences erected on them. Defendants have not erected a house on their lots and since 1965 have utilized their lots for recreational purposes from time to time without objection or complaint from the Homes Association as to the use of their property for recreational purposes until some time in 1972. Such recreational purposes have consisted of placing mobile campers and camping tents on their lots once or twice monthly during the spring and summer months. The duration of defendants' stay at their lots has normally been from one (1) to three (3) days on a weekend trip, but on several occasions longer stays have occurred. Defendants contend their longest stay has been five (5) days, while plaintiff contends the longest stay has been sixteen (16) days. Occasionally, defendants have invited guests to share in the recreational activities which the lake offers such as barbeques, campouts, swimming and fishing. With the exception of two church groups which used defendants' lots for a picnic, the guests consisted of one or two couples."

The Declaration of Restrictions, which was attached to and made a part of the stipulation of facts, provided in pertinent part as follows:

"THIS DECLARATION, made on this 19th day of March, 1964, by POMONA DEVELOPMENT COMPANY, INC., a corporation . . .

"WHEREAS, POMONA DEVELOPMENT COMPANY, INC. is the owner of the fee-simple title and does reserve the right to restrict in the manner hereinafter provided, all of the following described land being situate in the County of Osage, State of Kansas, to-wit:

. . . . . . . . . . . . .

"WHEREAS, the POMONA DEVELOPMENT COMPANY, INC. desires that the land above described shall be developed and used as an exclusive residential district.

"Now, THEREFORE, in consideration of the premises and to the end that said POMONA DEVELOPMENT COMPANY, INC., its successors and assigns and its future grantee, their successors and assigns and each of them may be protected and assured that the above described land subject to the exceptions hereinafter contained will be used for residential purposes only, said POMONA DEVELOPMENT COMPANY, INC. for it and its successors and assigns and for its grantees and their future grantees, does hereby agree and declare that all of the land above decribed shall be and the same is hereby restricted as to its use in the manner hereinafter set forth.

"PERSONS BOUND BY THESE RESTRICTIONS: All persons, firms, and corporations who now own or shall hereafter acquire any interest in any of the land which is hereby specifically restricted shall be taken and held to agree and covenant with the owner thereof and with their successors and assigns to conform to and observe the following covenants, restrictions and stipulations as to the use thereof and the construction of residences and improvements thereon; provided that these covenants are to run with the land and shall be binding on all parties and persons claiming under them; Provided

further that nothing herein contained shall be construed to prevent the continued use of said land or any part or parts thereof for the purposes for which it is now being used.

"SECTION I. USE OF THE LAND: All of the lots shall be known and described as residential lots and none of said land may be improved, used or occupied for other than private residential purposes except that this shall not prevent the location or use of one or more of the lots for the construction and maintenance of entrance walls, gates or gatehouses, or swimming pool facilities or bathhouses upon the swimming pool area, or boat houses or clubhouses facilities or a stable as may be determined by the POMONA DEVELOPMENT COMPANY, INC. No flat or apartment houses although intended for residential purposes, may be erected thereon. Any residences erected or being maintained thereon shall be designed for occupation by a single family and shall not exceed two stories in height and a private garage for not more than two cars.

"SECTION II. BILLBOARDS PROHIBITED:

. . . . . . . . . . . . . .

"SECTION III. ADDITION OF OTHER LAND: POMONA DEVELOPMENT COMPANY, INC. shall have and expressly reserves the right from time to time to add such other land as it may now own or may hereinafter acquire to the operation of the provisions of this declaration of restrictions by executing and acknowledging an appropriate agreement or agreements for that purpose and filing same for record in the office of the Register of Deeds of Osage County, Kansas. When other land is so subjected to the provisions hereof whether the same consists of one or more tracts or whether said addition shall be made at one or more times said land so added shall be subject to all of the terms and provision hereof in the same way and manner and with like effect as though the same had been originally described herein and subject to the provisions hereof.

"SECTION IV. DECLARATION OF RESTRICTIONS: Each of the restrictions above set forth shall continue and be binding upon the POMONA DEVELOPMENT COMPANY, INC. and upon its successors and assigns for a period of twenty (20) years from the first day of January, 1964 and shall automatically be continued thereafter for successive periods of five (5) years; Provided, however, that owners of the fee-simple title to the majority of the square feet of all the land then subject to the provisions thereof may release all of the land then subject to the provisions hereof from any one or more of said restrictions at the end of the first twenty (20) year period or any successive five (5) year period thereafter by executing and acknowledging an appropriate agreement or agreements in writing for such purpose and filing the same for record in the office of the Register of Deeds of Osage County, Kansas at least one year prior to the expiration of the twenty (20) year period or any successive five (5) year period.

"SECTION V. RIGHT TO ENFORCE: Each of the restrictions herein set forth shall run with the land and bind the present owner, its successors and assigns, and all parties claiming by, through or under it shall be taken to hold, agree and covenant with the owner of the said land and its successors and assigns and with each of them to conform to and observe said restrictions as to the use of said land and its successors and assigns and with each of them to conform to and observe said restrictions as to the use of said land and

the construction of the improvements thereon but no restrictions herein set forth shall be personally binding upon any corporation, person or persons except in respect of breaches committed during its or their seizing of title to said land; the owner or owners of any of the above described land and such other land as may hereinafter be subjected to the terms hereof shall have the right to sue for and obtain injunction, prohibitive or mandatory or any other legal or equitable relief to prevent the breach of or enforce the restrictions above set forth and/or recover damages for such violation. The invalidation of any one of these covenants by judgment or court order shall in no way affect any of the other restrictions which shall remain in full force and effect. The failure of the Pomona Development Company, Inc. or the owner of any other lot or tract of land hereby restricted or subsequently subjected hereto to enforce any of the restrictions herein set forth at the time of violation shall in no event be deemed to be a waiver of the right to do so. Pomona Development Company, Inc. may, by and through an appropriate agreement assign or convey to any person or corporation all of its rights, restrictions and privileges herein reserved to it.

"Section VI. Position of Residences on Lots: Every residence shall present an attractive frontage on the drive upon which said lot fronts. The ground between the building set back line set forth on the plat and the drive on which said residence fronts shall be used solely for lawn, driveway and walks, unless approval in writing is obtained from Pomona Development Company, Inc., its successors or assigns for the purpose of architectural effect, to save trees, or to avoid land contours or formations that make construction strictly in conformity with the building line an undue burden or unduly costly and for the purpose of enhancing the asthetic effect of the building position on any given lot. No residences or other improvements of a permanent nature shall be built on any land lying below the elevation of 1,008 feet nor may any residence or improvement be erected beyond the rear residence line, if any, set forth on the plat. No residence or other improvement may be erected within ten (10) feet of the side lines on any lot without prior written approval of the Pomona Development Company, Inc. No owner of any lot within the area affected by this declaration shall allow any grass or weeds on his lot to obtain a height in excess of five inches during the months of April through October inclusive of each year. No trash, litter, unsightly objects and debris shall be permitted to lie scattered about or upon any lot. Nor shall any owner fail to maintain the improvements on his lot in a condition satisfactory to the Pomona Development Company, Inc., its successors or assigns.

"Section VII. Private Drives: All roadways or drives within South Shore and such other additions as the Pomona Development Company, Inc. shall determine, shall be private and at least twenty (20) feet in width. Said private drives shall in no way be obstructed or blocked by any person or corporation subject to these restrictions nor shall any person or corporation subject to these restrictions permit or allow automobiles or other vehicles to be parked on said private drives.

"Section VIII. Size of Lot: No lot shall be subdivided in any way and all lots shall contain a minimum of 5,000 square feet, including the area over, under and across which easements have been reserved for sewers, utilities and access to the lake. Pomona Development Company, Inc., shall have and does hereby reserve the right to locate, erect, construct, maintain and use or

authorize the location, erection, construction, maintenance and use of drains, sanitary sewers, gas and water mains and lines, electric and telephone lines and other utilities and to give or grant rights-of-way or easements therefor over and upon any part of said land described herein.

"SECTION IX. SIZE OF RESIDENCE: Any residence erected upon any of the lots restricted shall contain a minimum of four hundred (400) square feet of living area.

. . . . . . . . . . . . . .

"SECTION XI. OUTBUILDINGS: No detached garage or other outbuildings of any kind or character may be erected on any of the lots restricted without the written consent of the POMONA DEVELOPMENT COMPANY, INC. *No mobile home, house trailer, basement, tent, shack, garage, barn or other garage or other outbuilding of a temporary character may be placed or erected on any land herein described for use or occupancy as a residence either temporary or permanent.* No one shall construct, erect, place or maintain any outhouse, privy, or open pit type toilet facility upon any lot. All trash and garbage shall be kept in covered containers and placed not closer than 10 feet from side lot boundaries. All butane, propane or other gas storage tanks shall be enclosed within a residence or other outbuilding or buried below ground level unless written approval to do otherwise shall have been secured from POMONA DEVELOPMENT COMPANY, INC., its successors and assigns.

. . . . . . . . . . . . . .

"SECTION XIII. NOXIOUS OR OFFENSIVE TRADE PROHIBITED: No business buildings shall be erected or business of any nature conducted on the land herein described. No noxious or offensive trade or activity shall be carried on upon any lot nor shall anything be done thereon which may become a common annoyance or a nuisance to the neighborhood.

"SECTION XIV. FENCES ALONG LOT LINE: No fences shall be erected or maintained on any of the lots nearer any drives than the front building line or on any easements hereinbefore or hereinafter granted except that decorative fences not to exceed 15 feet in length may be installed and maintained within an area not over ten (10) feet from the front of any residence.

"SECTION XV. APPROVAL OF CONSTRUCTION AND DESIGN: No construction shall be started on any building nor any alteration made in existing buildings nor any buildings moved upon the property unless and until the plans, specifications and exterior design shall first be approved in writing by POMONA DEVELOPMENT COMPANY, INC. its successors and assigns. All construction of any residence or other improvement must be completed within 180 days of the commencement date. No building materials of any kind or character shall be placed or stored upon any lot until approved plans have been obtained and a date has been established for the commencement of construction. No dock or boathouses may be erected until a permit has been obtained from the Pomona Lake Authority and written approval obtained from POMONA DEVELOPMENT COMPANY, INC., its successors or assigns. . . ." (Emphasis supplied.)

Following the filing of the stipulation of facts and the presentation of oral argument by counsel, the district court took the case under advisement. Thereafter the district court filed its Memorandum Decision granting injunctive relief in favor of the plaintiff.

The Memorandum Decision of the court in a clear and concise manner states the rationale of the court's decision as follows:

"MEMORANDUM DECISION

"No purpose would be served by setting forth herein the facts as all pertinent matters have been stipulated.

"The only question involved is whether the use made of their lots by the defendant owners violates par. XI of the Declaration of Restrictions dated March 19, 1964. Defendants have erected no buildings on the two lots but from time to time they and guests have pitched tents or camped out on the lots or stayed there in a camper or mobile home over weekends, and, in some instances, longer. Plaintiff does not claim that the usage of the lots in this manner has been other than intermittent.

"I find no ambiguity in the language of said par. XI. Using the lots in the manner stipulated plainly violates the restrictions therein contained. The context in which the word residence is used in said par. XI clearly indicates that it means a place of abode or dwelling and nothing more, be it residence, domicile or whatever, permanent or temporary.

"Defendants do not deny they purchased the land subject to the restrictions set forth in said declaration. They have had an interest therein since 1965 and obtained fee title in 1972. They appear to never have had as yet any intention of erecting permanent type living quarters on the lots. If defendants' usage in the manner above described is permitted to continue, however, the effectiveness of the restrictions could be thwarted so long as the defendants could describe their use as intermittent. To accept the defendants' position would also open up the remaining unimproved lots to the same sort of usage.

"The evidence does not sustain defendants' contention that there has been a change in the character of the subdivision such as would justify the Court in refusing to enforce said par. XI and there is no evidence of general and continuous violations of the several restrictions such as would constitute acquiescence or waiver on the part of plaintiff.

"The plaintiff is entitled to a permanent injunction restraining the defendants from locating mobile campers and camping tents upon the lands owned by them or permitting others to do so. . . ."

On this appeal the defendants first contend that the trial court erred in construing the language of Section XI of the Declaration of Restrictions to prohibit occasional recreational camping. The defendants maintain in substance that utilizing a tent or camper for general camping purposes is not prohibited by the restrictions because such use is not a use or occupancy of the property *as a residence.* In support of its position the defendants direct our attention to certain rules of construction which are usually applied by courts in construing and enforcing restrictive covenants which limit the use of property. It would be helpful to review some of these principles of law in order to resolve the issues presented on this appeal.

Restrictive covenants have long been recognized in this state.

A person who takes land with notice of restrictions upon it will not in equity and good conscience be permitted to act in violation thereof. (*Reeves v. Morris*, 155 Kan. 231, 124 P. 2d 488; *Hecht v. Stephens*, 204 Kan. 559, 464 P. 2d 258.) Such restrictions will be enforced by injunction and in a proper case a mandatory injunction will lie for the removal of buildings and structures in breach of such restrictions. (*N. P. Dodge Corp. v. Calderwood*, 151 Kan. 978, 101 P. 2d 883.) In *Sporn v. Overholt*, 175 Kan. 197, 262 P. 2d 828, we held that restrictive covenants in deeds are to be construed in accordance with the intent and purpose of the grantors after examination of the entire instrument under consideration. In *Sporn* the court dealt with land on which a dwelling was being constructed and construed a clause in a deed requiring that the property be used for residence purposes only. In the opinion the court stated as follows:

"The rules governing the construction of covenants imposing restrictions on the use of realty are the same as those applicable to any contract or covenant, including the rule that, where there is no ambiguity in the language used, there is no room for construction, and the plain meaning of the language governs. When construction is necessary, the language used will be given its obvious meaning. . . .

"Another well-settled rule is that covenants and agreements restricting the free use of property are strictly construed against limitations upon such use. Such restrictions will not be aided or extended by implication or enlarged by construction. Doubt will be resolved in favor of the unrestricted use of property. . . ." (p. 199.)

In *Sporn* the court also defined the word "residence" in terms that are applicable to the instant case. That definition was as follows:

"The words 'residence' or 'dwelling' in the sense in which they are ordinarily used and understood mean a house occupied as a residence by one or more families, in distinction from a store, office or other buildings." (Syl. 4.)

The granting of injunctive relief is, of course, equitable in nature and involves the exercise of judicial discretion. Whether injunctive relief will be granted to restrain the violation of a restrictive covenant is a matter within the sound discretion of the trial court to be determined in light of all the facts and circumstances. Absent manifest abuse of that discretion, an appellate court will not interfere. (*Hecht v. Stephens*, supra.) In its memorandum decision the trial court points out that the basic issue in the case is whether the use made of their lots by the defendant owners violated the purpose of Section XI of the Declaration of Restrictions. To determine that question consideration should be given to the Declaration of Restrictions in its entirety. When the

various sections of the Declaration of Restrictions are considered as a whole, in our judgment their purpose is clear and unambiguous. At the outset it is stated that it is the desire of the development company that its land should be developed and used as an *exclusive residential district*. It is next declared that the restrictions are executed to the end that the development company and its future grantees may be protected and assured that the land developed will be used for residential purposes only. Following these general statements of intention Section I of the restrictions declares that none of the land may be used or occupied for other than private residential purposes. No flat or apartment houses, although intended for residential purposes may be erected thereon. Section II prohibits the erection of billboards without the consent of the development company. Section IV makes provisions for the release of the restrictions by a majority of the property owners after the expiration of a twenty year period or at successive five year periods thereafter. Section VI requires that every residence present an attractive frontage on the drive upon which said lot fronts. The desirability of enhancing the "aesthetic effect" of each property is emphasized. No owner of any lot shall allow any grass or weeds to obtain a height in excess of five inches from April through October of each year. No trash, litter, unsightly objects or debris shall be permitted to lie scattered about or upon any lot. Section IX provides for a minimum of 400 square feet of living area in any residence erected upon any lot. Section XIII prohibits erection of business buildings or the carrying on of any noxious or offensive activity upon the property. Section XV requires the approval of plans and specifications by the development company before the construction of any building upon the property. That section also provides that no building materials of any kind shall be placed or stored upon any lot until approved plans have been obtained and a date set for commencement of construction.

It is obvious from a reading of these various sections of the Declaration of Restrictions that the developer intended to maintain the area as an unusually nice and exclusive residential area subject to a variety of restrictions reasonably calculated to maintain its exclusive nature. In our judgment the trial court was correct in finding that there were no ambiguities in the language of Section XI of the Declaration of Restrictions and that the use of the lots by the defendant for general camping purposes violated

the restrictions therein contained. In arriving at this conclusion we have considered the cases from other jurisdictions cited by counsel for the defendants in their brief. (*Builders, Inc. v. Hollar,* 7 N. C. App. 14, 171 S. E. 2d 60; *Hullett v. Grayson,* 265 N. C. 453, 144 S. E. 2d 206; *Harris v. Four Hills Development Corporation,* 79 N. M. 370, 443 P. 2d 863.) In our judgment each of those cases is distinguishable on its facts.

The defendants next contend that the trial court erred in ruling that there had not been a change in the character of the subdivision such as would justify the court in refusing to enforce Section XI of the Declaration of Restrictions. In support of their position counsel for the defendants argues that the apparent purpose for imposing restrictions was to develop a nice residential district with residences erected on each lot and that this purpose has been frustrated by the apparent lack of interest in lot owners in erecting residences. He points out that the restrictions became effective on January 1, 1964, and that only 26 lots out of 333 lots have residences erected upon them. Counsel is correct in his statement that covenants concerning the use of real estate will be enforced by equity only so long as they remain reasonable in the light of their purpose, taking into account changes in relevant conditions since the time they were made. (*Landau v. City of Leawood,* 214 Kan. 104, 519 P. 2d 676.) Stated in another way, where there has been a change in the character and conditions of a neighborhood to such an extent as to neutralize the benefits of a restrictive covenant and destroy its purpose, a court of equity is justified in refusing to enforce the restriction. (*Hecht v. Stephens,* supra.) However, in *Hecht* it is also pointed out that the extent of change in a neighborhood which will justify refusal to enforce restrictive covenants has not given rise to any hard-and-fast rule. Each case must rest on the equities of the situation as it is presented. A basic principle woven as a thread throughout all the decisions is that to warrant refusal of equitable relief, the change in conditions must be so great or radical as to neutralize the benefits of the restriction and destroy its purpose. In the case before us the trial court found that the evidence does not sustain defendants' contention that there has been a change in the character of the subdivision such as would justify the court in refusing to enforce Section IX. On the stipulated facts we cannot say that as a matter of law there has been a change in the character and conditions of the subdivision to such an extent as to neutralize the benefits of

the restrictive covenant and to destroy its purpose. While it is possible to speculate that the economy has frustrated the development of the area, there is no indication that it will not be further developed in years to come and we find no compelling reasons to refuse to enforce the restrictive covenant on this basis.

The defendants' last point on this appeal is that the trial court erred in holding that the plaintiff's right to enforce the restrictions has been lost by laches, waiver, or by acquiescence in the violation of the restrictions by the defendants. The substance of defendants' position is that they have utilized their lots for recreational camping since acquiring an interest in the property in 1965, that the plaintiff has acquiesced in these activities for seven years, and having made no objection or complaint, it should not be permitted at this late date to enforce the restrictive covenants. It is true that the right to enforce a restrictive covenant may be lost by laches, waiver, or acquiescence. (*Maurer v. J. C. Nichols Co.,* 207 Kan. 315, 485 P. 2d 174; *N. P. Dodge Corp. v. Calderwood,* supra; *Hecht v. Stephens,* supra.) This rule, however, is not an absolute one. Mere acquiescence will not bar enforcement so long as a restriction remains of any value. Here there is no evidence to show that the defendants have changed their position or that it would be inequitable to enforce the restrictions. Furthermore, we agree with the trial court that there is no evidence of general and continuous violations of the several restrictions such as would constitute acquiescence or waiver on the part of the plaintiff.

The judgment of the trial court granting injunctive relief is supported by the evidence and no abuse of its discretion has been shown. The judgment is affirmed.