**Paul F. HAMMERQUIST; Lowell L. Porter; and Lavina R. Porter, Plaintiffs and Appellees,**

v.

**John M. WARBURTON, Defendant and Appellant.**

**No. 16806.**

Supreme Court of South Dakota.

Considered on Briefs May 22, 1990.

Decided July 11, 1990.

William A. May of Costello, Porter, Hill, Heisterkamp & Bushnell, Rapid City, for plaintiffs and appellees.

Wayne F. Gilbert of Banks, Johnson, Johnson, Colbath & Huffman, Rapid City, for defendant and appellant.

MORGAN, Justice.

John M. Warburton (Warburton) appeals an order granting a permanent injunction against his utilizing his home as a two-family dwelling. We affirm.

This is a case about whether a restrictive covenant contained in a contract for deed runs with the land. To fully understand this litigation, it is necessary to retrace the creation of the restrictive covenant.

On October 30, 1970, Paul F. Hammerquist (Hammerquist), sold Tract P to William G. Porter (Porter) on a contract for deed. Paragraph 10 D of the contract provided:

It is agreed that Tract P and the additional homesites to be platted out of the above-described meadows area shall not be further subdivided and shall be restricted to one (1) family dwelling only, provided that each lot or tract may be

permitted to construct upon said home-site a guest home for guests of the owner of the building site which shall be restricted to nonpermanent use and will not be rented out for commercial purposes.

Hammerquist's father's deed to the land contained a related covenant: "That no building of any kind except a residence and a private garage shall be erected on any lot...." When Hammerquist sold Tract P to Porter, he had the restrictive covenant inserted in the contract for deed to maintain the neighborhood's single-family residential usage and unique character. All the dwellings in the vicinity have been single-family homes. The homes are in the Black Hills on wooded lots surrounding a mountain meadow. The nearby cliffs and hills retain remnants of a wooden mining flume built by Chinese laborers almost a century ago.

When the contract price was paid, Hammerquist gave a warranty deed to Porter, which was filed with the register of deeds on February 3, 1971. The deed neither mentioned the restrictive covenant nor made reference to the contract. The contract for deed itself was later filed on April 20, 1971.

Porter sold the property to another and it changed hands a few times before Warburton made an offer to purchase it. At the time Warburton became interested in buying Tract P, the property was in foreclosure through First Federal Savings and Loan (First Federal). The house has 3,500 square feet, with four bedrooms, two bathrooms, and two kitchens. Warburton told the realtor that he could not afford to live in it without some help from a tenant. Warburton planned to seal off a portion of the home and rent it to third parties. Yet, the property was in an area zoned "low density residential," prohibiting two-family residences. The realtor suggested that he ask for a Conditional Use Permit (CUP) from the Pennington County Planning Commission (Planning Commission). Warburton submitted a written offer to First Federal on March 3, 1983, which was ac-

cepted on the same day. The offer had the following condition:

This offer is contingent upon a 'special use permit' by Pennington County. This contingency is to be accomplished by April 1, 1983.

Before the Planning Commission heard his request, Warburton sent registered letters to all the surrounding owners telling them of his application and the time for the hearing before the Planning Commission. He also introduced himself to neighbors and explained what he was intending to do. Warburton met with Hammerquist who expressed concerns about the prospect of too many short-lived tenants and Warburton possibly being an absentee landlord.

The Planning Commission met on April 11, 1983. Warburton explained his reason for requesting the exception to the zoning ordinance. Hammerquist and Porter also appeared and expressed their concerns. Hammerquist feared Warburton would become an absentee landlord with two families renting the home. Porter warned the commission that if Warburton were permitted to rent out a part of the home it may establish a precedent permitting a change in the quality of the neighborhood. Neither Porter nor Hammerquist mentioned a restrictive covenant applicable to Tract P. Warburton assured the Planning Commission that he would not be an absentee landlord and that he intended to live in the home while having a small family rent the lower level. Warburton said that unless he could share expenses with someone else, he would not be able to afford the monthly mortgage, tax and insurance payments.

Despite the neighbors' concerns, the Planning Commission recommended to the County Commission that Warburton's request be granted. On April 12, 1983, the County Commission approved Warburton's CUP with a review in two years.

Two years later, on April 8, 1985, the Planning Commission reviewed Warburton's CUP. Once again Hammerquist and Porter appeared and expressed their concerns. Porter told the Planning Commission that Warburton was living in one unit and three to four young men were occupy-

ing the other. This use of the property was causing traffic problems, dogs were running loose, and tenants were holding loud parties, possibly without Warburton's knowledge. Both Porter and Hammerquist felt the area should continue with single-family residential zoning and the CUP should end. Warburton was not present at this meeting, so the Planning Commission postponed its decision to give him an opportunity to respond.

The Planning Commission met again on April 22, 1985, and at that time Warburton explained that he lived alone on the upper story of the home and had one tenant living in the lower story. The minutes of the Planning Commission reflect in part:

> Warburton continued that he had explained to the Commission two years ago when the CUP request was first heard that his plan to buy the home in question was contingent upon his being allowed to use the home as a two-family dwelling as the house is simply too large for one individual. He stated that since he has purchased the house he has removed the spiral staircase which had connected the upper and lower floors of the house and sealed the opening. Warburton also noted that one of the primary concerns expressed by land owners in the area when the CUP was first heard was that he (Warburton) would move out of the home, rent out the two units and act as an 'absentee landlord.' He emphasized that the upper story of his home has been and will continue to be his permanent residence, and he also noted although at the time the CUP was first granted he had anticipated renting the lower story to a family of three. It turned out that there has been just one tenant in that second unit; thus, even during those times when his tenant has had a roommate, there have been fewer people living in the home than he had originally projected.

Porter hired attorney Curt Ireland (Ireland) to appear before the Planning Commission. Ireland spoke of Warburton's absence from the home for long periods of time, the number of pickup trucks parked at the Warburton home, and noted that the sewer system serving the house was designed for one family. Most importantly, Ireland informed the Planning Commission that "the private covenants which apply to this subdivision allow only for single-family residences."

Although some Planning Commission members were concerned about whether the CUP should be renewed, most of its members felt that a denial at that time would place a severe hardship on Warburton as he had obtained the property on the belief that he could use the home as a two-family dwelling. The Planning Commission recommended that the CUP be extended for one year. After the meeting, Warburton told Porter that he anticipated marrying in a year and a half and after that the lower level would no longer be rented out. The marriage never took place. Later that year, Hammerquist warned Warburton that he intended to enforce the restrictive covenant.

The County Commission minutes of June 17, 1986, reflect that there were no complaints relating to Warburton's use of the home over the previous year. By unanimous vote, the County Commission extended the CUP for another three years. Plaintiffs assert they never received notice of that meeting. On July 13, 1988, Hammerquist and Porter commenced this action to enforce the restrictive covenant.

At the trial, Hammerquist and Porter expressed similar complaints about Warburton, his tenants and their pets: dogs ran loose and barked; trespassers were invited to the area by Warburton or his tenants; friends of Warburton's tenants were hunting illegally. As a consequence, there was increased danger, traffic, and noise. Both Hammerquist and Porter believe the value of their property has decreased since Warburton's tenants moved in.

Warburton insists that all his tenants have been responsible people. He now rents to a dentist and her husband. He believes that the value of his property has increased and the rental arrangement has not impaired surrounding home values.

Warburton had no actual notice of the restrictive covenant until April of 1985, well after the time he entered into the purchase agreement.

Warburton's theory of the case at trial was that the restrictive covenant had merged with the warranty deed and was not enforceable. He moved for summary judgment and it was denied on March 8, 1989.

In the subsequent trial to the court, Warburton again asserted his merger defense as well as the theory that Hammerquist and Porters had waived their right to enforce the restrictive covenant due to inaction. The trial court found against Warburton, holding that the restrictive covenant qualified as a collateral contractual provision that fell outside the doctrine of merger. Further, it found that Hammerquist and Porters had not waived their rights to enforce the covenant.

Warburton raises two issues:

1. Whether the trial court erred in holding that the restrictive covenants found in the contract for deed did not merge into the warranty deed; and

2. Whether the trial court was clearly erroneous in finding that Hammerquist and Porters had not waived their rights to enforce the restrictive covenant.

We first note our standards of review. As to the denial of summary judgment, it is well established that summary judgment is inappropriate if there are questions of facts to be determined. *Groseth Int'l., Inc. v. Tenneco, Inc.*, 410 N.W.2d 159, 164 (S.D. 1987). However, if the facts are undisputed, the issue becomes one of law for the court. *Gasper v. Freidel*, 450 N.W.2d 226, 229 (S.D.1990). As to any factual findings made by the trial court, we review them under the clearly erroneous standard. *Jankord v. Jankord*, 368 N.W.2d 571, 572 (S.D.1985). As to any conclusions of laws, they are reviewed under the error as a matter of law standard. *Wefel v. Harold J. Westin and Associates, Inc.*, 329 N.W.2d 624, 626 (S.D.1983). With these standards in mind, we proceed to Warburton's first issue, whether the contract for deed merged with the warranty deed.

While the general rule is that a deed executed in pursuance of a contract for the conveyances of real property supersedes and merges all prior negotiations or contracts relating to it, there are several exceptions to the rule. *Nelson v. Gregory County*, 323 N.W.2d 139 (S.D.1982); *Taylor v. White River Valley Ry. Co.*, 27 S.D. 528, 132 N.W. 152 (1911) *aff'd* 29 S.D. 12, 135 N.W. 758 (1912). These exceptions are the existence of "fraud or mistake or collateral contractual provisions or agreements which are not intended to be merged in the deed." *Nelson*, 323 N.W.2d at 142. The trial court denied Warburton's motion for summary judgment on the grounds that the restrictive covenant was a collateral agreement not intended to be merged into the warranty deed. We agree.

In deciding whether a contractual agreement is collateral, courts have looked to two factors: (1) whether the collateral contract forms an integral part of the principal purpose of the deed, namely conveyance of title and quantity of land, and (2) whether the parties intended the contract to be collateral. Using the first factor, this court in *Taylor, supra,* 132 N.W. at 157, held an agreement for maintenance of irrigation ditches by a railroad that was sold a right-of-way over plaintiff's property was collateral because the deed did not purport to cover it, and it was not a matter essential to transferring property rights.

A New York court in *Yaksich v. Relocation Realty Service Corp.*, 89 Misc.2d 410, 391 N.Y.S.2d 822 (1977), further articulated the reasoning behind this theory when it found that a contract for testing of a septic system was collateral to the deed.

> That rule [merger] does not properly apply however in situations ... where the contract provision is not an integral part of the principal purpose of the contract, namely a conveyance of title to real property. Absent proof of an intentional waiver, such separate, collateral undertakings unassociated with questions of title, possession or quantity of land may be deemed to have survived acceptance of the deed.

89 Misc.2d at 411–12, 391 N.Y.S.2d at 823 (citations omitted). *See also Brockport Developers Inc. v. 47 Ely Corp.*, 82 Misc.2d 310, 369 N.Y.S.2d 601 (1975) (continuing duties to supply sanitary sewer lines which outlived consummation of sale, not extinguished by deed); *Rapp v. Murray*, 112 Ohio App. 344, 349, 171 N.E.2d 374, 377 (1960) ("where contract contains many provisions relating to more than one subject, one of which provides for the transfer of title to real estate, the transfer of title to the real estate is only part performance of the obligations").

Here, just as in *Taylor* and *Yaksich*, the restrictive covenant was not an integral part of conveyance of title and quantity of land. Moreover, just as in *Brockport* and *Rapp*, the contract contained provisions relating to subjects other than transfer of title. It is important to note that the contract not only contains the one-person dwelling restrictive covenant, but also provisions beneficial to Warburton: an easement over adjoining property providing a private road to the property; a pedestrian easement permitting access to Rapid Creek; and a first right-of-refusal to purchase any homesite platted out of the meadow area which abuts on Rapid Creek. Clearly then, the mere transfer of the real estate title by warranty deed could not perform all the intended obligations, and the restrictive covenant was a collateral agreement. *Taylor, supra; Yaksich, supra; Brockport, supra; Rapp, supra.*

As to the second factor, it is clear that the original parties intended that the contract provisions would not merge into the deed. Section 10, containing the restrictive covenants, states:

*Special Provisions* The parties hereto agree that the following special provisions shall be applicable to this transaction and shall be binding to the parties hereto, their heirs, successors and assigns.

Further, the parties' filing the contract with the register of deeds is further proof that they considered the restrictive covenant collateral to the warranty deed. Put another way, if the contract was viewed as merged in the deed, the parties would not have bothered filing this document with the register of deeds.

Several of our sister courts examining this issue have looked to the parties' intent as being critical. *Southeastern Homes, Inc. v. Jackson*, 374 So.2d 341, 344 (Ala. Civ.App.1979) *writ denied* 374 So.2d 344 (Ala.1979) (intention of parties of paramount importance in deciding whether contract independent of deed); *Milu, Inc. v. Duke*, 204 So.2d 31, 33 (Fla.Dist.Ct.App. 1967) *reh'g denied* (Dec. 6, 1967) (merger does not apply if parties do not intend it).

While the original parties to the deed, by writing and their actions, demonstrated their intent for the contract to be collateral, Warburton claims he had no such intent. As will be discussed at length below, Warburton cannot take refuge in this position, since our law charges him with constructive knowledge of the restrictive covenant because it was properly filed with the register of deeds. *See Lunstra v. Century 21 GKR–Lammers Realtors*, 442 N.W.2d 448, 450 (S.D.1989).

Furthermore, we are not dissuaded from our position by the cases cited by Warburton on merger. *Riley v. Bear Creek Planning Committee*, 17 Cal.3d 500, 131 Cal. Rptr. 381, 551 P.2d 1213 (1976), is distinguishable because the house buyer purchased the home before any restrictive covenant was filed; therefore, he took without notice of the restrictive covenant. Here, the covenant was filed years before Warburton purchased the property and he is charged with notice.

The case of *Shoney's Inc. v. Cooke*, 291 S.C. 307, 312–13, 353 S.E.2d 300, 304 (1987), is simply a minority position that imposes an extremely harsh criterion on what may be a collateral agreement. Under *Shoney's* rationale, any agreement that could be in the deed, including all use restrictions, would be merged. Under this inflexible doctrine, not only would the restrictive covenant prohibiting one-family dwellings be merged, but Warburton's easement drive to his property along with the easement to Rapid Creek as well. This is not the law in this state, and we do not see any

wisdom in changing to this harsh rule. Therefore, we do not find that the trial court erred in denying Warburton's motion for summary judgment on the theory of merger.

■ Next, we examine Warburton's second issue concerning waiver. Warburton argues that even if the restrictive covenant survived merger, Hammerquist and Porter have waived the right to enforce the covenant by inaction and failing to enforce the covenant. We disagree.

■ The doctrine of waiver is applicable where one in possession of any right, whether conferred by law or by contract, and with a full knowledge of the material facts, does or forebears the doing of something inconsistent with the exercise of the right. To support the defense of waiver, there must be a showing of a clear, unequivocal and decisive act or acts showing an intention to relinquish the existing right. *Subsurfco, Inc. v. B-Y Water Dist.*, 337 N.W.2d 448, 456 (S.D.1983). The test for whether there is waiver of a restrictive covenant was succinctly set out in *Vaughn v. Eggleston*, 334 N.W.2d 870 (S.D.1983) *reh'g denied* (July 18, 1983).

The criteria for determining this includes whether those seeking to enforce the covenants had notice of the violation and the period of time in which no action was taken; the extent and kind of violation; the proximity of the violations to those who complain of them; any affirmative approval of the same; whether such violations are temporary or permanent in nature; and the amount of investment involved.

*Id.* at 873 (citations omitted). Using those six criteria, we examine the facts before us.

First, Porter and Hammerquist had notice of the violation in 1983 when Warburton applied for the Conditional Use Permit. Though five years passed before a lawsuit was filed, throughout this period they expressed their opposition to Warburton's use of the property as a multi-family dwelling. These objections were done primarily at Planning Commission meetings. However, Hammerquist did inform Warburton in Au-

gust, 1987, at the Knecht Home Center in Rapid City, that he planned to enforce the covenant.

The trial court rightly did not find the length of time dispositive. During this time period, Hammerquist and Porter were attempting to resolve the problem short of filing a lawsuit. We will not penalize them for attempting to solve their problem out of court. *Mt. Baker Park Club v. Colcock*, 45 Wash.2d 467, 472, 275 P.2d 733, 736 (1954) (reasonable delay in filing suit not fatal to enforcement of building restriction, where delay due to desire to procure compliance by means other than litigation). Moreover, Mr. Hammerquist's health problems (emphysema and stroke) were a factor in his not being able to immediately pursue the lawsuit.

Also, though the trial court was correct in finding that Warburton did not have actual knowledge until 1985, by law he is charged with knowledge from 1983 because the contract containing the restrictive covenant was properly filed. As was made clear in *Lunstra*:

The constructive notice furnished by a recorded instrument, so far as every material fact recited therein is concerned, is equally as conclusive as would be actual notice acquired by a personal examination of the recorded instrument or actual notice acquired by or through other means.

442 N.W.2d at 450. *See also South Shore Home Ass'n v. Holland Holiday's*, 219 Kan. 744, 750, 549 P.2d 1035, 1042 (1976) (person who takes land with notice of restrictions on it, will not be permitted to act in violation thereof).

Second, the extent and kind of violation is that Warburton used the home as a two-family dwelling the entire five-year period. The violation manifested itself in the other family (tenants or guests) allowing dogs to run free, trespassing on plaintiffs' property and creating a danger by hunting in this residential area.

Third, the proximity of the violation is very close. Hammerquist's property surrounds Warburton's property on three

sides. As alluded to above, Warburton's guests or tenants have trespassed on plaintiffs' property.

Fourth, there has never been approval of Warburton's use of his house. Hammerquist and Porter have complained at almost every opportunity about it, including the period of time before Warburton purchased the home, when the CUP was requested. Though the restriction was not specifically mentioned until 1985, plaintiffs plainly made their opposition known.

Fifth, the violation is permanent. It will continue, since Warburton cannot afford to make the house payments unless he has tenants.

Sixth, both parties have invested substantial money in their properties. Therefore, the trial court did not find this dispositive.

■ Warburton is correct in arguing that the parties do not really contest the factual findings made by the trial court and that it is the trial court's legal conclusion as to waiver that he claims are in error. We do not find the trial court's findings as to waiver were clearly erroneous. Nor, given the standard that the defense of waiver must be proved by a showing of clear, unequivocal and decisive acts to show relinquishment of existing rights, that the trial court erred as a matter of law in holding there was not a waiver of rights.

We affirm.

All the Justices concur.