Melvin DUCHENEAUX, Plaintiff and Appellee,

v.

Eugene MILLER, Defendant and Appellant.

No. 17640.

Supreme Court of South Dakota.

Argued April 21, 1992.

Decided July 1, 1992.

Rehearing Denied Aug. 5, 1992.

Thomas M. Maher of Maher and Arendt, Keith A. Tidball, Pierre, for plaintiff and appellee.

Kennith L. Gosch of Bantz, Gosch, Cremer, Peterson & Oliver, Aberdeen, for defendant and appellant.

WUEST, Justice.

Melvin Ducheneaux (Ducheneaux) commenced this action against Eugene Miller (Miller) alleging breach of contract, deceit, and breach of implied warranty as a result of a sale by Miller to Ducheneaux of a herd of cattle in 1987. Miller counterclaimed for the amount due on the contract for the purchase of cattle. The matter was tried to the court. Miller appeals the trial court's judgment awarding Ducheneaux compensatory damages of $103,832.28, prejudgment interest in the amount of $58,074.74, and punitive damages of $25,000. Miller raises ten issues on appeal. We have combined and rearranged some issues and will discuss them as follows:

1. Whether the trial court erred in finding Miller breached the contract.
 a. Whether the trial court erred in interpreting a provision in the cattle sales contract requiring Miller to provide a "clean bill of health."
 b. Whether the first contract for sale of cattle was extinguished by a later agreement through novation.
 c. Whether Ducheneaux waived any breach of the contract by entering into a second agreement with Miller after he became aware the cattle were quarantined.
2. Whether the trial court erred in awarding punitive damages for deceit.
 a. Whether Miller had a duty to disclose information pursuant to SDCL 20-10-2(3) and whether he breached that duty.
 b. Whether the trial court's award of punitive damages was proper where it found Miller was guilty of willful, wanton or malicious conduct.
3. Whether the trial court's award of "actual damages" was clearly erroneous.
 a. Whether the trial court erred in its calculation of damages.
 b. Whether Ducheneaux took reasonable steps to mitigate his damages.
4. Whether the trial court's award of prejudgment interest was proper.

We affirm in part, reverse in part and modify the damage award.

## BACKGROUND FACTS

Ducheneaux is an enrolled member of the Cheyenne River Sioux Indian Tribe and owns 320 acres of land on the Cheyenne River Indian Reservation in Dewey County. This land, together with grazing rights to other lands, gave Ducheneaux's ranch a carrying capacity of 500-600 cows. In the spring of 1987, Ducheneaux obtained a BIA guaranteed loan for use in stocking his ranch. He planned to purchase 500 cows with calves in the spring of 1987, and to sell the calves by early fall. The cows were then to be sold in November or December of 1987. Ducheneaux planned to use the proceeds to pay back the loan and to buy more cattle.

Miller is a farmer/rancher living near Isabel who also owns and operates a small construction business. Although Miller's formal education is limited, he has significant business experience and has served as Chairman of the Board of Directors of the Dewey County Bank. Miller has substantial experience in the buying, raising, and selling of cattle, although most transactions were handled through commission sale yards. Miller had one prior experience involving brucellosis infected cattle.

Jeff Weber (Weber), a livestock order buyer and owner/operator of the Timber Lake sale barn, located a herd of approximately 600 cattle in New Mexico at the Buddy Majors ranch early in 1987. In March 1987, Miller made a deal to purchase 600 head at $495.00 per head. He wired $230,000.00 to seller's mortgagee, the Bank of Albuquerque, as part payment, but the bank returned the money with a letter stating that members of the herd had failed a

Bangs (brucellosis)[1] test. Miller later purchased the herd in early April at a cost of $480.00 per head after personally inspecting the herd at the Majors ranch. Prior to closing the transaction, the bank offered Miller $10,000.00 to cancel the deal. Miller refused the offer believing the herd could be cleaned up and resold for a substantial profit. He also suspected the bank had another buyer willing to pay more for the herd.

On April 10, 1987, while still in New Mexico, Miller contacted Dr. Sam Holland, a veterinarian employed by the South Dakota Livestock Sanitary Board. He told Dr. Holland there were some Bangs suspects in the herd. Based on the limited history furnished by Miller, Dr. Holland would not authorize shipment of the cattle to South Dakota. Instead, Weber shipped the herd to the Don Dukat ranch near Gordon, Nebraska.

Miller returned to South Dakota. On April 16, he went to Nebraska after Dukat called and told him the herd had arrived in poor condition. Dukat told Miller the cattle were malnourished and some of the cattle had died en route.

When the cattle arrived in Nebraska, Dukat's neighbors notified Nebraska health authorities, and Dr. Sahara, a veterinarian in the employ of the Nebraska Department of Agriculture, immediately quarantined the entire herd because the health certificates were not in order, because the cattle were in a very weakened condition, and because it did not appear the cattle had been tested for brucellosis within thirty days prior to import as required by Nebraska law. Arrangements were made to blood test the herd after the herd had time to recover from the stress of shipping.

On May 18, 1987, Dr. Sahara, Dr. Michael McCarthy, a veterinarian from Gordon, Nebraska, and others examined and blood tested 561 of the 563 cows (the remaining two were calving that day). Since Miller planned to move the herd to South Dakota, Sahara also checked for Bangs tattoos which indicate whether the animal had been calfhood vaccinated against brucellosis as required by South Dakota law before cattle can be legally imported. In the course of the examination, the doctors compared identifying marks on the cattle with the New Mexico health documents.

The results of the May 18 testing showed eight "reactors" and twenty-one "suspects."[2] The reactors were sold for slaughter and the suspects were isolated from the herd for future testing. Among other things, the doctors observed 198 of the cows were ineligible for import to South Dakota because they lacked a visible Bangs tattoo.

On June 2, 1987, Dr. Sahara, Miller, and others met at the Dukat ranch for a discussion of the investigation findings. At the trial, Dr. Sahara testified Miller was notified, on June 2, of the presence of suspects and reactors and that 198 cows had no visible tattoos thereby making them ineligible for shipment to South Dakota. Miller disputes this on appeal. He claims he only learned thirty-one of the cows were ineligible for import to Nebraska. Later in June, Sahara also told Miller eleven of the fourteen cows found to be suspects in the New Mexico test had actually been included in the shipment to Nebraska, a violation of Nebraska law.

## FACTS

The trial court found the following facts some of which are disputed. On July 14, 1987, Ducheneaux and Miller executed a "cattle contract" in which Ducheneaux agreed to buy the herd of approximately 551 cows located at the Dukat ranch. Ducheneaux agreed to pay a total purchase price of $395,965.00, or approximately

1. Brucellosis is a disease which causes cows to abort and may infect humans causing great weakness, night sweats, remittent fever and generalized aches and pains. It is commonly referred to in the cattle business as Bangs disease.

2. According to Dr. Sahara's testimony an animal classified as a "reactor" has a high probability of being infected with Bangs disease. A "suspect" can neither be classified as a non-reactor or a reactor.

$718.00 per head. The contract called for a $265,000.00 down payment, with the balance payable on or before October 15, 1987, or before the cows were branded. Miller was to pay for pasture through October 15. The agreement also called for "a clean bill of health" to be furnished by Miller. The contract was handwritten by Miller. Ducheneaux paid $265,000.00 down but claims he was never able to bring the cows or calves to his South Dakota ranch because of the presence of suspects and reactors in the herd.

The trial court concluded when Miller sold the herd to Ducheneaux on July 14, Miller was fully aware of the herd's health history. He knew the herd was illegally in Nebraska and was under quarantine in Nebraska because of positive brucellosis tests and because of irregular health documents. Miller knew the herd did not have a clean bill of health and could not get a clean bill of health for South Dakota import for another six to seven months because, according to Dr. Holland's testimony, the herd must have two negative "whole herd" tests within 180 days to be removed from quarantine. The trial court found the health history of the cattle and the test results were all material facts relating to the marketability of the herd.

Although Miller had substantial information by July 1987, concerning the health history and marketability of this herd, he failed to tell Ducheneaux that 198 of the cows could not be shipped to South Dakota at any time because they lacked visible Bangs tattoos. Miller knew Ducheneaux planned to stock his South Dakota ranch with this herd, yet he did not tell Ducheneaux that, as early as February or March, reactors and suspects had been found and removed from this herd. He did not tell Ducheneaux some of the reactors had actually been shipped to Nebraska with the rest of the herd in violation of Nebraska law. Ducheneaux was unaware until mid-October 1987, when he made arrangements to have the cows and calves shipped to South Dakota, that the herd could not be shipped to South Dakota.

Miller called several veterinarians trying to get health documents for the herd. Ducheneaux and others, on his behalf, contacted various authorities in an effort to move the herd to South Dakota.

Given the herd's reputation in the Gordon, Nebraska area, Ducheneaux believed the calves would not sell well, if at all, there. Before Ducheneaux could sell the calves in South Dakota, South Dakota health officials required him to have the heifer calves spayed. The bull calves had already been castrated. Ducheneaux sold 431 calves at the Highmore sale ring in October 1987.

Ducheneaux was still unable to move the cows to South Dakota because Miller had never obtained health papers. Indeed, Miller failed to have a follow-up whole herd Bangs test done after the test conducted in mid-May 1987 by Dr. Sahara which revealed suspects and reactors. Such follow-up tests are required by South Dakota law before cattle which originate from a herd which produces suspects or reactors may be imported. Given the lack of available feed at the Dukat ranch and lack of health documents for import to South Dakota, Ducheneaux was forced to move the cows to the Funk ranch, some 250 miles east of Gordon, near Ewing, Nebraska. Subsequent testing showed 252 of the cows were open (unbred).

On November 9, 1987, Ducheneaux and Miller entered into an "extension of [the] agreement dated July 14[, 19]87." The extension agreement provided Ducheneaux was to purchase 491 head of cows at $746.00 each with 412 calves plus an additional thirty-one calves at $300.00 each for a total cost of $375,586.00. The balance of the contract price ($109,116.00) was due December 15, 1987. Interest of thirteen percent was to accrue on the unpaid balance from October 15, 1987 until the purchase price was paid in full. Ducheneaux was to pay feed costs associated with keeping the cows at the Funk ranch.

After Ducheneaux made an unsuccessful attempt to sell some of the cows at the Bassett, Nebraska sale barn as breeders,

all of the cows were eventually sold for slaughter. Ducheneaux brought this action alleging breach of contract, breach of warranty, and fraudulent misrepresentation. Miller denied Ducheneaux's claims and affirmatively alleged waiver, novation, and failure to mitigate damages. By counterclaim, Miller sought the balance due on the contract of approximately $21,000.00.

The trial court concluded Miller breached the contract by failing to provide a clean bill of health, which would allow import of the herd to South Dakota. It awarded Ducheneaux the damages set out above. The trial court also found Miller committed deceit, as defined in SDCL 20-10-2(3), by suppressing material facts and awarded punitive damages.

## STANDARD OF REVIEW

▮ A trial court's findings of fact are presumed correct unless they are shown to be clearly erroneous. *Chamberlain Livestock Auction v. Penner,* 462 N.W.2d 479, 482 (S.D.1990); *Sperry Corp. v. Shaeffer,* 394 N.W.2d 727, 730 (S.D.1986) (citing SDCL 15-6-52(a)).

This court may not substitute its judgment of factual questions for that of the trial court unless the findings of fact are clearly erroneous. *Northern Farm Supply Inc. v. Sprecher,* 307 N.W.2d 870 (S.D.1981). In applying the "clearly erroneous" standard, we do not ask whether we would have made the same findings as did the trial court. Rather, the test is whether, after reviewing all the evidence, we are left with a definite and firm conviction that a mistake has been made. *Temple v. Temple,* 365 N.W.2d 561 (S.D.1985); *Cunningham v. Yankton Clinic, P.A.,* 262 N.W.2d 508 (S.D. 1978); *In Re Estate of Hobelsberger,* 85 S.D. 282, 181 N.W.2d 455 (1970). The findings of fact made by the trial court are presumptively correct. The burden to show error is on the appellant. *Temple, supra; Hilde v. Flood,* 81 S.D. 25, 130 N.W.2d 100 (1964).

*Penner,* 462 N.W.2d at 482 (quoting *Rosebud Sioux Tribe v. Strain,* 432 N.W.2d 259, 265 (S.D.1988)). Further, "[t]his court

is not free to disturb the lower court's findings unless it is satisfied that they are contrary to a clear preponderance of the evidence." *Cunningham,* 262 N.W.2d at 512 (citing *Potter v. Anderson,* 85 S.D. 142, 178 N.W.2d 743 (1970)). The credibility of witnesses, the weight to be accorded their testimony, and the weight of the evidence must be determined by the trial court and we accord the trial court some deference based on its observations of the witnesses and the evidence. *Gross v. Gross,* 355 N.W.2d 4, 9 (S.D.1984) (citing *Nicolaus v. Deming,* 81 S.D. 626, 139 N.W.2d 875 (1966)). *Accord Fullerton Lumber Co. v. Reindl,* 331 N.W.2d 293, 296 (S.D.1983) (citing SDCL 15-6-52(a) (1984); *Estate of Hobelsberger,* 85 S.D. 282, 181 N.W.2d 455.

Furthermore, in a court trial, '[u]pon review, the evidence and inferences therefrom must be viewed in a light most favorable to uphold the verdict [judgment] and, if there is competent and substantial evidence to support the verdict [judgment], it must be upheld.'

*Gross v. Conn. Mut. Life Ins. Co.,* 361 N.W.2d 259, 273 (S.D.1985) (quoting *Dougherty v. Beckman,* 347 N.W.2d 587, 590 (S.D.1984). *Accord Opp v. Nieuwsma,* 458 N.W.2d 352, 358 (S.D.1990); *Farmer's State Bank v. Westrum,* 341 N.W.2d 631, 634-35 (S.D.1983).

## I. BREACH OF CONTRACT

### A. *"Clean Bill of Health."*

▮ The original contract, signed by Miller and Ducheneaux on July 14, 1987, required Miller to provide a "clean bill of health" for the cattle. The trial court found Miller breached the contract for the sale of cattle to Ducheneaux "by failing to provide a clean bill of health, which would allow import of the herd [into] South Dakota."

South Dakota law requires an owner to test female cattle for Bangs within thirty days prior to importation into South Dakota for dairy or breeding purposes. Moreover, female cattle must have been calfhood vaccinated against brucellosis. Finally, no cattle may be imported into South Dakota if they originated from a herd that,

when tested, reveals suspects or reactors, until the entire herd subsequently passes a negative test. SDCL 40–7–20 (1985) (amended 1990 and 1992) (this statute, as it appeared at all times relevant to this appeal is set out in note 4 *infra*).

Miller asserts the language was inserted into the July contract to assure Ducheneaux the quarantine on the herd would be released. The cattle were released from quarantine on July 22, 1987, with the exception of twelve "suspects" and thirty-one "nonvaccinates." [3] Thus, Miller asserts the trial court's finding that he breached the contract was clearly erroneous.

Ducheneaux counters, arguing Miller failed to provide a clean bill of health of any kind because each time the cattle were tested by the authorities, reactors and/or suspects were found. He further argues, Miller knew 198 head could *never* be shipped to Ducheneaux's ranch in South Dakota because they had not been calfhood vaccinated as required by SDCL 40–7–20.[4] Ducheneaux argues "a clean bill of health" means the cattle must have passed the brucellosis tests required by state and federal law for sale or interstate shipment of cattle.

■ Obviously, the parties disagree about what providing a "clean bill of health" means. Before extrinsic matters can be examined to determine the parties'

intent, a provision must be ambiguous. "[A] contract may be said to be ambiguous when 'it is reasonably capable of being understood in more than one sense." *Enchanted World Doll Museum v. Buskohl*, 398 N.W.2d 149, 151 (S.D.1986) (quoting *Ponderosa–Nevada, Inc. v. Venners*, 90 S.D. 579, 243 N.W.2d 801 (1976); *Jones v. American Oil Co.*, 87 S.D. 384, 387, 209 N.W.2d 1, 3 (1973)). "Whether the language of a contract is ambiguous is ordinarily a question of law." *Id.; Jensen v. Pure Plant Food Intern'l., Ltd.*, 274 N.W.2d 261, 264 (S.D.1979).

"A contract is not rendered ambiguous simply because the parties do not agree on its proper construction or their intent upon executing the contract." 17A Am.Jur.2d *Contracts* § 338 (1991). *Accord Johnson v. Johnson*, 291 N.W.2d 776, 778–79 (S.D. 1980). Rather a contract is ambiguous only when "it is capable of more than one meaning when viewed objectively by a reasonably intelligent person who has examined the context of the entire integrated agreement and who is cognizant of the customs, practices, usages and terminology as generally understood in the particular trade or business." 17A Am.Jur.2d § 338. *See also City of Sioux Falls v. Henry Carlson Co., Inc.*, 258 N.W.2d 676, 679 (S.D.1977).

**3.** No brucellosis was ever found to be actually present in the herd. The presence of the reactors and the suspects may have been caused by late vaccination of some of the cattle (called overage vaccination). Vaccination should be done while cattle are less than one year old.

**4.** At the time relevant to this appeal, SDCL 40–7–20 provided in pertinent part:

No person shall bring or cause to be brought into this state any female dairy cattle over six months of age or any female beef cattle over twelve months of age for dairy or breeding purposes ... within this state that have not been officially calfhood vaccinated against brucellosis and are negative to the brucellosis test administered within thirty days prior to importation, if such livestock are test-eligible pursuant to rules promulgated by the livestock sanitary board. No person shall bring or cause to be brought into this state any livestock that originate in herds or lots if the herd or lot when tested revealed suspects or reactors to a brucel-

losis test, until the herd or lot has subsequently passed a negative test at least thirty days after the suspect or reactor was removed from the herd or lot in which it originated. No person shall acquire within this state except by his own raising, any female dairy cattle over six months of age or any female beef cattle over twelve months of age for dairy or breeding purposes ... within this state that have not been officially calfhood vaccinated against brucellosis. "Officially calfhood vaccinated" means a bovine female beef animal vaccinated against brucellosis while from two through twelve months of age or a bovine female dairy animal vaccinated against brucellosis while from two through six months of age[.] ... Any person violating the provisions of this section is guilty of a Class 6 felony. This statute was reworded in 1990, and further amended in 1992, but because all the events involved in this lawsuit occurred prior to 1990, the amendments do not apply. Moreover, the amendments would not alter the outcome of this case.

Dr. McCarthy testified a "clean bill of health" refers to a veterinarian's statement that, to his knowledge, the animals are not ill and have not been exposed to a contagious disease.[5] However, under cross-examination, Dr. McCarthy admitted the term means different things to different people in the cattle industry. He also pointed out the rather uniform definition of "release from quarantine." That term means the cattle are free to move in the normal channels of commerce.

The above testimony indicates an ambiguity may indeed have been injected into the contract because of Miller's use of the term "clean bill of health." However, since Miller drafted the contract, any ambiguity, if one exists, does not help him. "[O]ne who speaks or writes a contract can by exactness of expression more easily prevent mistakes in meaning than one whom with he is dealing[;] therefore[,] any doubts arising from ambiguity of language are resolved in favor of the latter." *Buskohl*, 398 N.W.2d at 152 (citing Williston on Contracts § 621 (1961)); *Forester v. Weber*, 298 N.W.2d 96, 97 (S.D.1980); *Henry Carlson Co.*, 258 N.W.2d at 679.

Ducheneaux and Miller both reside near Timber Lake, South Dakota. It is clear from Ducheneaux's testimony he informed Miller he needed the cattle to stock his ranch in South Dakota. Moreover, when Miller took out a loan to buy the cattle in New Mexico, he told the bank he would be bringing the cattle to South Dakota. Thus, there is ample evidence to indicate the parties' intent was to bring the cattle to South Dakota. The definition of "clean bill of health" utilized by the trial court was consonant with the parties' intent. We conclude the trial court was not clearly erroneous in interpreting the contract as requiring Miller to provide a clean bill of health so the cattle could be imported into South Dakota.[6]

### B. *Novation.*

■ Miller next argues the November contract, which did not contain a clause requiring Miller to provide a clean bill of health, constitutes a novation or new agreement which supersedes the July contract.

The trial court disagreed, finding there was insufficient evidence of intent to extinguish the old obligation. The trial court found the later agreement modified, rather than extinguished, the July 14 contract and did not eliminate the requirement that Miller produce a clean bill of health.

The November agreement, which was entered into after Ducheneaux became aware of the herd's health problems, states it is an "extension of [the] agreement dated July 14[, 19]87." It modified the earlier agreement by providing for fewer cows at a higher unit price—491 cows with 412 calves at $746.00 for each cow, plus an additional thirty-one calves at $300.00 each for a total price of $375,586.00 [7]—and provides, among other things, that Ducheneaux would pay the feed costs at the Funk ranch.

■ SDCL 20-7-6 (1987) defines a "novation" as the substitution of a new obligation, with the intention to extinguish the old obligation. Novation is an affirmative defense; and therefore, it was Miller's burden to prove a novation took place. *See Haggar v. Olfert*, 387 N.W.2d 45, 49 (S.D. 1986).

---

5. Black's law dictionary defines a clean bill of health as "one certifying that no contagious or infectious disease exists or certifying as to healthy conditions generally without exception or reservation." *Black's Law Dictionary* 227 (5th Ed.1979).

6. Miller's argument that the trial court violated the parol evidence rule seems incongruous with his earlier argument that a clean bill of health means released from quarantine. His very argument indicates the terms he used were ambiguous. Parol evidence is admissible to explain a written contract that is uncertain or ambiguous. *Habeck v. Sampson*, 88 S.D. 437, 221 N.W.2d 483, 486 (S.D.1974); *Eggers v. Eggers*, 79 S.D. 233, 110 N.W.2d 339 (S.D.1961).

7. 

| | |
|---|---|
| 491 cattle at $746.00 each 412 calves included | $366,286.00 |
| 31 calves at $300.00 each | 9,300.00 |
| Total Cost: | $375,586.00 |

Essential elements of novation are: (1) a previous valid obligation, (2) agreement of all parties to the substitution under a new contract based on sufficient consideration, (3) extinguishment of the old contract, and (4) the validity of the new contract. Clear and convincing evidence is required in order to justify setting a written contract aside and holding it abandoned or substituted by subsequent parol evidence or contract.

*Id.* at 50. (Citations omitted). "Novation is not effective unless there is an intention on the part of the parties to extinguish the old obligation by substituting the new one therefore." *Hyde v. Hyde,* 78 S.D. 176, 99 N.W.2d 788, 791 (citing *Klinkoosten v. Mundt,* 36 S.D. 595, 156 N.W. 85 (1916)). "The existence of such an intention may ... be found, even though there is nothing positive in the agreement.... [T]he intention to substitute one contract for another ... may be inferred from the circumstances." *Id.* (quoting 39 Am.Jur. *Novation* § 21). *Accord Haggar,* 387 N.W.2d at 50.

As stated earlier, the trial court found the parties did not intend to extinguish the July 14 contract. We cannot say that finding was clearly erroneous. It would defy common sense to believe Ducheneaux intended to extinguish the clean bill of health requirement when Ducheneaux had only recently become aware that 198 head of the cattle could not come into South Dakota absent an unlikely waiver from the State Livestock Sanitary Board and that no follow-up blood test had been performed on the herd as required by state law. Moreover, Ducheneaux testified Miller continuously assured him "the deal would get straightened up" and he would be able to ship the cattle into South Dakota. Finally, the second agreement, also handwritten by Miller, is entitled an extension. It extends

the time of payment of the balance of the amount Ducheneaux owed from October 15 to December 15, 1987 and indicated Ducheneaux was to pay interest on the outstanding balance. Nothing in the instrument indicates it was intended to extinguish the July 14 agreement.

### C. *Waiver of Breach.*

■ Miller next argues Ducheneaux "waived" or excused Miller's failure to provide a clean bill of health for the cattle. Miller argues Ducheneaux voluntarily entered into the second agreement "[a]rmed with the knowledge that the cattle could not come into South Dakota, that they had been under quarantine, that the heifer calves had to be spayed before they could be brought into South Dakota and that the herd looked horrible[.]" What Miller neglects to point out is that, during the entire episode, Ducheneaux and Miller met several times and Miller continuously assured Ducheneaux the problem would be resolved, and Ducheneaux would be able to import the cattle to South Dakota.

■ Waiver is defined in *Hammerquist v. Warburton,* 458 N.W.2d 773 (S.D. 1990) as follows:

The doctrine of waiver is applicable where one in possession of any right, whether conferred by law or by contract, and with a full knowledge of the material facts, does or forebears the doing of something inconsistent with the exercise of the right. To support the defense of waiver, there must be a showing of a clear, unequivocal and decisive act or acts showing an intention to relinquish the existing right.

*Id.* at 778; *Subsurfco v. B–Y Water Dist.,* 337 N.W.2d 448, 456 (S.D.1983) (citing *Babcock v. McKee,* 70 S.D. 442, 18 N.W.2d 750 (1945)).[8]

---

**8.** Ordinarily, acceptance of performance after default in performance waives the right to rely on the default in bringing a cause of action. *City of Gering v. Patricia G. Smith Co.,* 337 N.W.2d 747, 750 (Neb.1983). However, intent to acquiesce or waive is essential to establishing a waiver to a breach of contract, *Harsha v. State Sav. Bank,* 346 N.W.2d 791, 799 (Iowa 1984), and a waiver must therefore be a voluntary,

intentional relinquishment of a known right, *Bissell v. L.W. Edison Co.,* 9 Mich.App. 276, 156 N.W.2d 623, 627 (1967). No waiver exists where acceptance is induced by fraud. *City of Gering,* 337 N.W.2d at 750. Finally, to waive a right, one must have full knowledge of the facts and knowledge of the breach. *See Northern Petrochemical Co. v. Thorsen & Thorshov, Inc.,* 297 Minn. 118, 211 N.W.2d 159, 169 (1973);

Looking at the evidence in a light most favorable to the decision, as we must, it appears Ducheneaux relied on Miller's assurances the herd's health problems and lack of a clean bill of health would be remedied by Miller. Evidence in the record indicates the parties tried to work out the problem by contacting veterinarians in an effort to get health documents for the herd. There is no showing Ducheneaux intended to relinquish his right to a clean bill of health for the herd. Therefore, Ducheneaux's act of entering into an extension agreement did not constitute a waiver of Miller's breach of the agreement to provide a clean bill of health. We conclude the trial court was not clearly erroneous in its finding Miller breached his obligation to provide a clean bill of health.

## II. DECEIT

Miller and Ducheneaux disagree as to whether Ducheneaux was aware of the herd's health problems prior to October 1987. Ducheneaux testified consistently he was unaware of these problems until he tried to truck the cattle to South Dakota in October 1987. The trial court found Ducheneaux did not know of the health problems until October. Where the trial court resolves conflicts in the evidence, we are not free to change its findings. *Gross*, 361 N.W.2d at 266; *Mulder v. Tague*, 85 S.D. 544, 186 N.W.2d 884 (1971).

### A. *Duty to Disclose.*

The trial court found Miller "committed deceit, as defined by SDCL 20–10–2(3) by suppressing of fact(s) by a person bound to disclose them." SDCL 20–10–1 (1987) provides:

> One who willfully deceives another, with intent to induce him to alter his position to his injury or risk, is liable for any damage which he thereby suffers.

Further, SDCL 20–10–2 (1987) provides in pertinent part:

> A deceit within the meaning of § 20–10–1 is [ ]:
>
> (3) *The suppression of a fact by one who is bound to disclose it,* or who gives information of other facts which are likely to mislead for want of communication of that fact[.]

(Emphasis added).

Miller argues the trial court's finding was clearly erroneous because Miller is not a person bound by SDCL 20–10–2(3) to disclose facts. Miller contends the transaction was an arm's length business transaction; and as such, there was no obligation on the part of Miller to disclose any information to Ducheneaux. Under the facts of this case, we disagree.

Miller relies primarily on *Taggart v. Ford Motor Credit Co.*, 462 N.W.2d 493, 499 (S.D.1990) wherein this court stated, "The first clause of SDCL 20–10–2(3) imposes liability for suppression of a fact only on 'one who is bound to disclose' the fact." We noted further "[t]his court has never imposed a duty to disclose information on parties to an arm's length business transaction, absent an employment or fiduciary relationship." *Id.* It is undisputed no employment relationship existed between Miller and Ducheneaux. Nor was there a fiduciary relationship between Ducheneaux and Miller. *See Mash v. Cutler*, 488 N.W.2d 642, 652–653, No. 17604, slip op. at 19–20 (S.D.1992); *Taggart*, 462 N.W.2d at 500. However, this does not end our inquiry.

In *Taggart* we discussed Restatement (Second) of Torts Sections 550 [9] and 551(2). We held neither of these sections applied in

---

*Wegner v. West,* 169 Neb. 546, 100 N.W.2d 542, 547 (1960); *Einot, Inc. v. Einot Sales Co.,* 154 Neb. 760, 49 N.W.2d 625, 627 (1951).

**9.** Restatement (Second) of Torts § 550 (1977) provides:

§ 550. Liability for Fraudulent Concealment
One party to a transaction who by concealment or other action *intentionally prevents* the

other from acquiring material information is subject to the same liability to the other, for pecuniary loss as though he had stated the nonexistence of the matter that the other was thus prevented from discovering. (Emphasis added).

§ 550 requires *active concealment.* An example would be if a seller painted over and concealed a defect in a chattel. Comment a.

*Taggart* because the defendants were not parties to the transaction. Here, however, both Ducheneaux and Miller were parties to the transaction. Restatement (Second) of Torts section 551(2)(e), referred to in *Taggart,* provides:

§ 551. Liability for Nondisclosure

. . . .

(2) One party to a business transaction is under a duty to exercise reasonable care to disclose to the other before the transaction is consummated,

. . . .

(e) *facts basic to the transaction,* if he knows that the other is about to enter into it under a mistake as to them, and that the other, because of the relationship between them, the customs of the trade or other objective circumstances, would reasonably expect a disclosure of those facts.

(Emphasis supplied). Comment 1 provides in pertinent part:

It is extremely difficult to be specific as to the factors that give rise to this known, and reasonable, expectation of disclosure. In general, the cases in which the rule stated in Clause (e) has been applied have been those in which *the advantage taken of the plaintiff's ignorance is so shocking to the ethical sense of the community, and is so extreme and unfair, as to amount to a form of swindling, in which the plaintiff is led by appearances into a bargain that is a trap, of whose essence and substance he is unaware.* In such a case, even in a tort action for deceit, the plaintiff is entitled to be compensated for the loss that he has sustained. *Thus a seller who knows that his cattle are infected with tick fever or contagious abortion is not free to unload them on the buyer and take his money, when he knows that the buyer is unaware of the fact, could not easily discover it, would* *not dream of entering into the bargain if he knew and is relying upon the seller's good faith and common honesty to disclose any such fact if it is true.* (Emphasis added).[10]

Restatement section 551(2) and comment 1 are directly on point with the situation before us. The trial court found the presence of suspects and reactors was a material fact. The comments to section 551(2)(e) strongly support a finding that the presence of the suspects and reactors was a fact "basic to the transaction." It is beyond cavil Ducheneaux would never have entered into this transaction had he known of the presence of suspects and reactors in the herd. Moreover, Miller knew Ducheneaux intended to bring these cattle to his own ranch in South Dakota, yet he failed to disclose to Ducheneaux that 198 head had not been calfhood vaccinated and, therefore, could *never* come into South Dakota. These were facts basic to the transaction. The trial court specifically found Miller's intent "was to remove himself from a herd of cattle that he knew had substantial problems, involving failing health tests required for resale or interstate shipment of cattle, and to make a substantial profit at the same time."

We hold Miller had a duty to disclose the presence of suspects and reactors and the status of the 198 non-calfhood-vaccinated cattle. The trial court resolved conflicting evidence and concluded Ducheneaux was not aware of the herd's problems until October. The trial court's finding that Miller committed deceit as defined by SDCL 20–10–2(3) is not clearly erroneous.

B. *Award of Punitive Damages.*

 The trial court awarded punitive damages in the amount of $25,000 based upon its finding that Miller was guilty of deceit. The trial court found the deceit met the statutory limitation for punitive damages of breach of "an obligation not arising from contract." SDCL 21–3–

---

**10.** Comment 1 states further:

There are indications, also, that with changing ethical attitudes in many fields of modern business, the concept of facts basic to the transac-

tion may be expanding and the duty to use reasonable care to disclose the facts may be increasing somewhat. This Subsection is not intended to impede that development.

2(1987).[11] Finally, the trial court found based upon clear and convincing evidence Miller was guilty of willful, wanton or malicious conduct as required by SDCL 21–1–4.1 (1987).

Miller challenges the award of punitive damages in two respects. He claims there was no duty to disclose and, therefore, no deceit as defined in SDCL 20–10–2(3). We have already resolved this issue against Miller. Second, Miller points out SDCL 21–3–2 does not permit the recovery of punitive damages where a defendant was not guilty of oppression, fraud or malice. Since the trial court did not make these specific findings, Miller argues the award of punitive damages was improper.

SDCL 21–3–2 provides:

> In any action for the breach of an obligation not arising from contract, where the defendant has been guilty of oppression, fraud, or malice, ... the jury, in addition to the actual damage, may give damages for the sake of example, and by way of punishing the defendant.

The trial court found Miller was guilty of willful, wanton or malicious conduct as required by SDCL 21–1–4.1. Further, the trial court set out very detailed findings of facts regarding punitive damages. The trial court specifically found Miller was guilty of deceit. It further found Miller was aware of the herd's health history prior to entering into the contract; that Miller knew Ducheneaux planned to stock his South Dakota ranch with the cattle, yet failed to inform Ducheneaux of the herd's status (presence of suspects and reactors; 198 head ineligible for import into South Dakota); and that Miller intended to "remove himself from a herd of cattle he knew had substantial problems" and to make a substantial profit at the same time. These findings are sufficient to support an award of punitive damages. They indicate Miller was guilty of fraud and that he acted with malice. *See Groseth Intern., Inc. v. Tenneco, Inc.*, 440 N.W.2d 276, 279 (S.D.1989); *Yankton Prod. Credit Ass'n. v. Jensen*, 416 N.W.2d 860, 863 (S.D.1987).

Finally, we discuss an issue alluded to by Miller regarding the propriety of awarding punitive damages where a breach of contract is involved. SDCL 21–3–2 permits the award of punitive damages only for "the breach of an obligation not arising from contract[.]" In *Hoffman v. Louis Dreyfus Corp.*, 435 N.W.2d 211 (S.D.1989), this court was presented with a situation very similar to the facts before us now. In that case, a party was induced to enter into a contract through the use of deceit. *Id.* at 215. We agreed with the general proposition:

> Exemplary damages are not ordinarily recoverable in actions for breach of contract, because, as a general rule, damages for breach of contract are limited to the pecuniary loss sustained.

*Id.* at 214 (quoting 22 Am.Jur.2d *Damages* § 751 (1988)). We also recognized another "longstanding" proposition:

> 'Conduct which merely is a breach of contract is not a tort, but the contract may establish a relationship demanding the exercise of proper care and acts and omissions in performance may give rise to tort liability.'

*Id.* (quoting *Kunkel v. United Security Ins. Co.*, 84 S.D. 116, 135, 168 N.W.2d 723, 733 (1969)). *Accord Groseth*, 440 N.W.2d at 279.

> The independent tort must be separate and distinct from the breach of contract. While the intentional tort may occur at the time of and in connection with the breach, or may arise out of the same transaction, it is not committed merely by breaching the contract, even if such act is intentional.

*Hoffman*, 435 N.W.2d at 214. (quoting 22 Am.Jur. *Damages* § 752 (1988)). Intention-

---

**11.** The trial court found, in addition, Miller's actions constituted a breach of the Bangs/brucellosis laws of both the state of South Dakota and the state of Nebraska, as well as federal laws and regulations requiring proper health papers for interstate transportation of animals; and that the breach involved the public welfare and interest in controlling and preventing the spread of Bangs disease. However, Ducheneaux did not allege these violations in his complaint as a basis for punitive damages and the trial court denied his motion to amend the complaint.

al misrepresentation is defined by SDCL 20–10–1 as a wilful deception made with the intention of inducing a person "to alter his position to his injury or risk."

More than a finding of knowledge of falsity is required to warrant a conclusion of liability based on intentional misrepresentation.... We have held that an action for deceit requires proof that the misrepresentations were material to the formation of the contract and that the plaintiff relied on the misrepresentations to his detriment. *Aschoff v. Mobil Oil Corp.*, 261 N.W.2d 120 (S.D.1977); *Schmidt v. Wildcat Cave, Inc.*, 261 N.W.2d 114 (S.D.1977); *Viajes Iberia, S.A. v. Dougherty*, 87 S.D. 591, 212 N.W.2d 656 (S.D.1973).

*Littau v. Midwest Commodities, Inc.*, 316 N.W.2d 639, 643 (S.D.1982). Like the deceit involved in *Hoffman*, the deceit here was intended to induce Ducheneaux to enter into a contractual relationship with Miller in order that Miller could "remove himself from a herd of cattle he knew had substantial problems." The trial court found the misrepresentations were material to the contract. We believe the tort committed was independent of the breach of contract and justified the award of punitive damages. We therefore uphold the trial court's award of punitive damages.

## III. DAMAGES

"In an action for breach of contract, the plaintiff is entitled to recover all his detriment proximately caused by the breach, not exceeding the amount he would have gained by full performance." *Regan v. Moyle Petro. Co.*, 344 N.W.2d 695, 696 (S.D.1984); *Big Band, Inc. v. Williams*, 87 S.D. 24, 202 N.W.2d 121, 123 (1972). *Accord* SDCL 21–1–5 (1987).[12] In other words, the ultimate purpose behind allowance of damages for breach of contract is to place the injured party in the position he or she would have occupied if the contract had been performed, *Macal v. Stinson*, 468 N.W.2d 34, 36 (Iowa 1991), or to "make the injured party whole," *Hulstein v. Meilman Food Industries, Inc.*, 293 N.W.2d 889, 891 (S.D.1980). The trial court's findings on damages will not be disturbed on appeal unless they are clearly erroneous. *Tri–State Refining v. Apaloosa Co.*, 452 N.W.2d 104 (S.D.1990).

### A. *Trial Court's Calculation of Compensatory Damages.*

The trial court awarded Ducheneaux "actual" damages of $103,832.28.[13] Miller alleges the trial court made several errors in its computation. We will discuss his most convincing allegations first.

Miller first alleges the trial court used the contract price, $375,586.00, as its

**12.** SDCL 21–2–1 (1987) provides in pertinent part:

For the breach of an obligation arising from contract, the measure of damages, except where otherwise expressly provided by this code, is the amount which will compensate the party aggrieved for all the detriment proximately caused thereby, or which, in the ordinary course of things, would be likely to result therefrom.

SDCL 21–1–5 provides in pertinent part:

Notwithstanding the provisions of these statutes, no person can recover a greater amount in damages for the breach of an obligation than he could have gained by the full performance thereof on both sides[.]

Also applicable are SDCL 57A–2–714 (1988) and SDCL 57A–2–715 (1988). SDCL 57A–2–714 provides in pertinent part:

(1) Where the buyer has accepted goods and given notification (subsection (3) and § 57A–2–607) he may recover as damages for any nonconformity of tender the loss resulting in the ordinary course of events from the seller's

breach as determined in any manner which is reasonable.

....

(3) In a proper case any incidental and consequential damages under § 57A–2–715 may also be recovered.

SDCL 57A–2–715 provides in pertinent part:

(1) Incidental damages resulting from the seller's breach include ... reasonable expense incident to the delay or other breach.

**13.** The trial court calculated the damages as follows:

| | |
|---|---|
| Contract Amount | $375,586.00 |
| Allowable Expenses | 107,014.17 |
| Subtotal | 482,600.17 |
| Less Sales | 323,642.89 |
| | 158,957.28 |
| Less Purchase of 75 cows by Miller | 55,125.00 |
| Out of pocket loss ............... | $103,832.28 |

beginning point when, in fact, Ducheneaux never paid the full contract price. Ducheneaux asserts in his brief that, as of early 1988, he had paid $357,773.53 on the contract, which would leave an outstanding balance of $17,812.47. Put another way, Miller's counterclaim asserted, on February 4, 1987, an outstanding balance of $109,116 existed together with accrued interest owing of $3,186.42 (any outstanding balance after October 15, 1987 was subject to a thirteen percent interest charge). On that date, Ducheneaux paid $91,303.53, leaving an outstanding balance of $20,998.89, or approximately $21,000 (which is still accruing interest). SDCL 57A–2–607(1) (1988) provides where a buyer accepts goods (here cattle), the buyer must pay at the contract rate for the goods accepted.[14] Thus, the trial court clearly erred in failing either to award Miller his counterclaim for $21,000 or to deduct that amount from Ducheneaux's damages.

■ Miller next claims the trial court erred by failing to deduct from the damage award $16,450.00 in proceeds Ducheneaux received from the sale of forty-seven "mix lite" calves either to Weber or through Weber. Ducheneaux admitted during redirect examination he forgot to deduct this amount in his damages exhibit. Thus, the trial court clearly erred in failing to reduce Ducheneaux's damage award by this amount. It does not appear from the record, and Ducheneaux does not claim, he incurred any added expense in connection with this sale which was caused by Miller's breach. Therefore, the expenses incurred in selling these calves will not be added to Ducheneaux's "allowable expense" award. The "out of pocket loss" must be reduced by the gross sales amount of $16,450.00.

■ Miller next argues the trial court improperly granted an award for feed expense in the amount of $28,373.96. It appears $22,947.22 of this amount was paid to Jeff Weber for feed supplement to be fed to the cattle while they remained at the Funk ranch. The trial court found Duche-

neaux agreed to pay for feeding the cattle at the Funk ranch, yet included this feed bill as allowable expense in its damage award (see supra note 13). That Ducheneaux did, in fact, agree to pay the feed expense associated with keeping the cattle at the Funk ranch was specifically set out in the extension agreement. This element of damages is clearly erroneous. The remainder of the feed expense, $5,426.74, was a result of Miller's breach and was properly awarded as damages.

■ The other alleged errors propounded by Miller are less convincing. Many of these involve conflicting testimony. The trial court is in a better position to judge the credibility of witnesses and to resolve conflicts in testimony. Accordingly, "[w]e are not at liberty to change findings where the trial court has resolved conflicts in the evidence." Gross, 361 N.W.2d at 266. Accord Mulder, 85 S.D. 544, 186 N.W.2d 884. The alleged errors involve the amount the trial court awarded Ducheneaux for expenses involved in caring for and reselling the cattle. The trial court awarded $107,-014.17 as allowable expenses. In discussing the proper measure of damages incurred where a buyer breached an agreement to purchase livestock, this court stated, "[T]he excess, if any, of the expenses properly incurred in carrying the property to market over those which would have been incurred for the carriage thereof, if the buyer had accepted it, is recoverable by the party claiming a breach of the contract." Olson v. Rydl, 25 S.D. 268, 126 N.W. 587, 588 (1910).

■ Miller first attacks the sale-barn charges for brand inspections, commission expenses, beef check off, health inspection, and yardage fees in an amount of $5,376.36. While it is true Ducheneaux intended to sell the entire herd by December of 1987, it is doubtful he would have incurred as much expense as was incurred here due to Miller's breach. "Under any damage model, 'there need only be a reasonable basis for measuring the loss and it

14. Miller argues the Uniform Commercial Code (U.C.C.) does not apply to this transaction. Cattle meet the definition of goods as set out in SDCL 7A–2–105(1) (1988). The U.C.C. does apply. SDCL 57A–2–102 (1988).

is only necessary that damages can be measured with reasonable certainty.' " *Tri–State Refining,* 452 N.W.2d at 110 (quoting *Schmidt,* 261 N.W.2d at 118). "Where doubt exists as to certainty of damages, those doubts should be resolved against the wrongdoer." *Id.* The trial court's award of these damages is not clearly erroneous.

■ Miller next argues the trial court improperly awarded $8,061.85 in trucking expense. Although it is true Ducheneaux knew the cattle were in Nebraska and would have to be trucked to his ranch in South Dakota, it is also true that, had Miller not breached the contract, Ducheneaux would only have been required to ship the cattle once. As a result of the breach, Ducheneaux was forced to truck the cattle to various stockyards in sometimes unsuccessful attempts to sell them. In addition, the cattle had to be shipped 250 miles to the Funk ranch as the Dukat ranch was no longer suitable for grazing. Moreover, when Ducheneaux first learned of the quarantine, he already had arranged to have the cattle shipped, resulting in a wasted trip for the trucking company he had hired. We uphold this element of the trial court's award.

■ Miller next quarrels with the awarded veterinary expenses of $2,077.00. These expenses were incurred as a result of Miller's breach. The heifer calves could only be brought into South Dakota if they were spayed because they originated from a herd which contained suspects and reactors. Certain calf implants were necessary because the calves were in poor shape. This award of damages was proper.

■ Finally, Miller challenges the $8,000.00 award for expenses incurred in hiring twenty bulls to service the herd. Miller claimed he already paid this expense to Weber on Ducheneaux's behalf. Suffice it to say there was conflict in the testimony as to this fact and we cannot say the trial court's award was clearly erroneous. Miller is currently suing Weber and, if appropriate, can recover this amount from him.

B. *Mitigation of Damages.*

The law imposes upon a party injured from another's breach of contract or tort the active duty of making reasonable exertion to render the injury as light as possible. If, by his negligence or willfulness, he allows the damages to be unnecessarily enhanced, the increased loss, that which was avoidable by the performance of his duty, falls upon him. This is a practical duty under a great variety of circumstances, and, as the damages which are suffered by a failure to perform it are not recoverable, it is a duty of great importance.

*Gardner v. Welch,* 21 S.D. 151, 110 N.W. 110, 112–13 (1906). Miller attacks the trial court's damage award by arguing Ducheneaux did not properly mitigate his damages. The trial court found Ducheneaux took reasonable steps in an effort to mitigate his damages.

■ The herd could not be transported to South Dakota because it had never tested negative for suspects and reactors. SDCL 40–7–20. Ducheneaux testified the reputation of the herd in the Gordon, Nebraska area was notorious. Indeed, it was a neighbor who, after observing the cattle being unloaded at the Dukat ranch, notified the Nebraska veterinarian immediately. The trial court accepted Ducheneaux's version of events after having a full opportunity to view his credibility during a lengthy cross-examination.

The trial court found it was not unreasonable for Ducheneaux to spay the heifer calves so they could be sold outside the Gordon, Nebraska area. They were eventually sold in Highmore, South Dakota under directions from Dr. Thorpe, the South Dakota State Veterinarian, that they be spayed prior to their sale in South Dakota.

Further, the trial court found it was not unreasonable to send the cows to a different area to be sold. To sell the cattle for breeding purposes, Ducheneaux had to sell them in Nebraska. Ducheneaux attempted to sell some of the cattle at the Bassett, Nebraska sale barn. That sale was not completed because, once again, suspects and reactors were found. After this, the

cattle were sent to the Onida, South Dakota feedlot for slaughter.

■ The breaching party has the burden of proving damages would have been lessened by the exercise of reasonable diligence on the part of the non-breaching party. *Hepper v. Triple U Enterprises, Inc.*, 388 N.W.2d 525, 530 (S.D.1986); *Renner Elevator Co. v. Schuer*, 267 N.W.2d 204, 207 (S.D.1978). We do not believe Miller has satisfied that burden. The trial court's finding that Ducheneaux properly mitigated his damages is not clearly erroneous.

### IV. PREJUDGMENT INTEREST

■ Miller's final contention on appeal is with the trial court's award of prejudgment interest in the amount of $58,074.74. We shall first summarily dispose of Miller's argument that the trial court used the wrong rate of interest (fifteen percent). Miller mistakenly relies on SDCL 21–1–13.1 (1992 Supp.), which was not enacted until 1990, to support his argument that the proper interest rate is twelve percent. Because this cause of action was brought prior to July 1, 1990, SDCL 21–1–13.1 simply does not apply. *Honomichl v. Modlin*, 477 N.W.2d 599, 600 (S.D.1991). Prior to the passage of SDCL 21–1–13.1, SDCL 21–1–11 (1987) and SDCL 21–1–13 (1987) governed the award of prejudgment interest. Since neither statute specified what rate of interest should be utilized, under SDCL 54–3–4 (1990) (in effect on July 1, 1987) interest is payable at the category C rate of interest which, pursuant to SDCL 54–3–16(3) (1990), is fifteen percent.

Miller also disputes the propriety of the prejudgment interest award. He argues primarily the award was improper because damages must be certain or capable of being made certain under SDCL 21–1–11. Miller's reliance on SDCL 21–1–11 is misplaced. The interest award was based on the tort claim of deceit. SDCL 21–1–13 provides:

> In an action for the breach of an obligation not arising from contract, and in every case of oppression, fraud, or malice, interest may be given, in the discretion of the jury.

We have already held the trial court's finding of deceit was not clearly erroneous and its punitive damages findings amounted to a finding of fraud and malice. "The trial judge was the fact finder in this case and could properly award prejudgment interest for fraud damages in his discretion." *Tri-State Refining v. Apaloosa Co.*, 431 N.W.2d 311, 316 (S.D.1988) (citing *Winterton v. Elverson*, 389 N.W.2d 633 (S.D. 1986)). We conclude awarding prejudgment interest was not an abuse of discretion. However, the amount was calculated using an improper damage award. We have held the award must be reduced by the amount still owed by Ducheneaux on the contract plus contract interest of thirteen percent (as of October 9, 1990, Miller claims $26,866.48 was due); by the amount of the $22,947.22 feed bill which was awarded to Ducheneaux but which Ducheneaux had agreed to pay; and by the amount Ducheneaux admitted receiving as sales proceeds from calves he sold to or through Weber in the amount of $16,-450.00. Recalculating the amounts, the proper award due Ducheneaux is $34,-797.79 actual damages plus $19,462.81 prejudgment interest plus $25,000 punitive damages for a total award of $79,260.60.[15]

---

**15.** Damages are calculated as follows.
Amount Ducheneaux owes on the unpaid contract amount:

| Date: | Amount: | Comment: |
| --- | --- | --- |
| Feb. 4, 1988 | $ 20,998.89 | Amount outstanding as of Feb. 4, 1988 |
| | | (contract rate 13%). |
| Feb. 4, 1989 | $ 2,729.86 | Interest accrued. |
| 1990 | 2,729.86 | |

## DISPOSITION

We affirm the trial court's finding that Miller breached the contract entered into with Ducheneaux and that Miller was guilty of deceit. However, we reverse in part the trial court's compensatory damage award and modify the prejudgment interest in accordance therewith and remand to the trial court to amend its judgment consistent with this opinion.

MILLER, C.J. and HENDERSON, SABERS and AMUNDSON, JJ., concur.

| Date: | Amount: | Comment: |
|---|---|---|
| 1991 | 2,729.86 | |
| Feb. 5, 1991 to April 5, 1991 | 448.80 | (60 days at $7.48 per day). |
| | $ 8,638.38 | Total interest accrued as of April 5, 1991. |
| | 20,998.89 | |
| | $ 29,637.27 | Owed as of April 5, 1991. |

Reduction on trial court's actual damage award:

| | | |
|---|---|---|
| | $ 103,832.28 | |
| | (29,637.27) | Amount Ducheneaux owes Miller. |
| | (22,947.22) | Feed bill improperly awarded. |
| | (16,450.00) | Sale proceeds from calves sold to or through Jeff Weber. |
| | $ 34,797.79 | Amount trial court should have awarded. |

Calculation of prejudgment interest (at 15%):

| | | |
|---|---|---|
| July 14 to Dec. 31, 1987 | $ 2,445.30 | (171 days at $14.30 per day). |
| 1988 | 5,219.67 | |
| 1989 | 5,219.67 | |
| 1990 | 5,219.67 | |
| Jan. 1 to Apr. 5, 1991 | 1,358.50 | (95 days at $14.30 per day). |
| | $ 19,462.81 | |

Total Award:

| | | |
|---|---|---|
| | $ 34,797.79 | Actual damages. |
| | 19,462.81 | Prejudgment interest. |
| | 25,000.00 | Punitive damages. |
| | $ 79,260.60 | |