# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 03-1920

_____

| | | |
|---|---|---|
| Credit Card Debt Solutions, Inc. , | * | |
| | * | |
| Appellant, | * | |
| | * | Appeal from the United States |
| v. | * | District Court for the |
| | * | District of South Dakota. |
| Home Federal Bank, formerly known | * | |
| as Home Federal Savings Bank, | * | |
| | * | |
| Appellee. | * | |

_____

Submitted:  December 18, 2003

Filed:  April 13, 2004

_____

Before RILEY, LAY, and HEANEY, Circuit Judges.

_____

HEANEY, Circuit Judge.

This case involves a contractual dispute between Credit Card Debt Solutions, Inc. (CCDS) and Home Federal Bank (Home Federal).  After the parties submitted cross-motions for summary judgment, the district court[1] granted summary judgment in favor of Home Federal.  CCDS appeals this determination, and we affirm.

_____

[1]The Honorable Andrew W. Bogue, United States District Judge for the District of South Dakota.

## I. Background

Home Federal entered the credit card business, offering credit to high risk applicants. Once Home Federal approved the credit applications, it did not service the accounts; rather, it outsourced this function to First Data Resources (FDR). After being approached by an intermediary, CCDS agreed to purchase Home Federal's "charged-off" accounts – accounts that were 180 days or more in arrears. The purchase agreement (Agreement) set a closing date of February 23, 1999. CCDS paid six cents on the dollar for the right to collect on these accounts, which included accounts that were charged-off prior to January 1, 1999. The outstanding balances totaled $7,534,819.33.

On March 4, 1999, Home Federal fired the head of its credit card department, Hugh Fullerton, because he increased his personal credit line in violation of company policy. A subsequent investigation of the department revealed that Fullerton had been receiving kickbacks from a marketing firm in connection with the credit card operation. Fullerton, apparently motivated by these kickbacks, had been expanding the sub-prime credit card operation despite evidence that this was not a profitable strategy. Home Federal ultimately settled with its bonding company for $700,000 – the amount reflecting the loss Home Federal incurred as a result of Fullerton's mismanagement of the credit card department.

Subsequent to the closing of the sale, and while CCDS was attempting to collect on the outstanding accounts, CCDS discovered that the package of accounts it purchased from Home Federal included secured credit card accounts. Secured accounts differed from unsecured accounts in the following manner: In order to open a secured account, applicants were required to pay $225 as a deposit that would be applied to the account balance in the event of nonpayment. No customers paid the $225 up front; instead, Home Federal charged the $225 to the newly opened credit

card, treating it like a cash advance.[2] In its internal accounting records, Home Federal debited its loan account, showing a $225 loan to the credit card purchaser, and credited its demand deposit account by the same amount. According to Home Federal, this transaction was reversed when each account was charged-off. FDR's system, however, did not reflect this reversal at the time CCDS purchased the accounts.

After CCDS brought the existence of the secured accounts to Home Federal's attention, the parties began negotiations to compensate CCDS for its overpayment for the secured accounts. In the Agreement, the parties included a clause to deal with unenforceable accounts. Home Federal determined the $225 advances were

---

[2]The Security Agreement between Home Federal and the cardholder states:

SECURITY AGREEMENT. This is a secured credit card account. You agree that, to secure the repayment of your obligations under this Account, we will charge $225.00 to your Account to establish a non-interest bearing security deposit. This charge is posted to your Account as a Cash Advance and is subject to a periodic Finance Charge from the date of posting until it is paid. However, Cash Advance fees, as described below, do not apply to this charge. You hereby grant a security interest in this deposit to us as collateral to secure all of your obligations to us on this Account. You agree that, without notice to you, we may exercise our rights as a secured creditor to apply this security deposit to the amounts you owe to us if you are delinquent, in default or your Account is closed for any reason. You agree that we may assign this collateral to any party that acquires our rights in your Account. YOU AGREE THAT YOU DO NOT HAVE ACCESS TO ANY FUNDS IN YOUR SECURITY ACCOUNT UNTIL NINETY (90) DAYS AFTER YOUR ACCOUNT HAS BEEN CLOSED AND ALL OUTSTANDING AMOUNTS DUE ON YOUR ACCOUNT HAVE BEEN PAID IN FULL.

(Appellant's App. at 35.)

unenforceable,[3] credited $225 to each of the secured accounts, and gave CCDS a check for $23,902.98. Home Federal arrived at this amount by totaling all of the security deposits, $398,382.96, and multiplying the total by .06. By Home Federal's calculation, the $23,902.98 represented CCDS's overpayment. CCDS cashed this check.

CCDS, unsatisfied with this resolution, filed a complaint seeking the full amount of the security deposits and, in the alternative, rescission of the entire Agreement. CCDS later amended its complaint to include fraud and deceit claims, alleging that Home Federal had an obligation to inform CCDS of Fullerton's mismanagement of the credit card operation. After considering the parties' cross-motions for summary judgment, the district court granted Home Federal's motion for summary judgment. In regard to the secured accounts, the district court found that the $23,902.98 payment fairly compensated CCDS. Any higher amount, the court reasoned, would result in a windfall to CCDS. As to CCDS's deceit claim, the district court found that Home Federal did not have a duty to disclose information it may have had about Fullerton because that information did not include facts basic to the transaction.

## II. Analysis

This court reviews de novo the district court's grant of summary judgment. Computer Aided Design Sys., Inc. v. Safeco Life Ins. Co., 358 F.3d 1011, 1012 (8th Cir. 2004). In doing so, we must examine the record in the light most favorable to the nonmoving party. State Auto. Ins. Co. v. Lawrence, 358 F.3d 982, 985 (8th Cir. 2004). Summary judgment should be awarded when there is "no genuine issue as to

---

[3]This particular scenario was not listed as an example of an unenforceable account in the Agreement.

any material fact" and the movant is entitled to a judgment as a matter of law.  Fed. R. Civ. P. 56(c).

## A.  Secured Accounts

### 1. Breach of Contract

Under South Dakota law,[4] a breach of contract occurs when an enforceable promise is made, the promise is breached, and damages follow as a result of that breach.  McKie v. Huntley, 620 N.W.2d 599, 603 (S.D. 2000).  On appeal, CCDS argues that the district court erred in finding that CCDS did not have a claim to the secured accounts' security deposits and hence incurred no damages.  CCDS renews its argument that Home Federal's $225 credit to each of the secured accounts constituted a "payment, credit, or other consideration" to which it was entitled under the terms of the Agreement.[5]

As a preliminary matter, we must resolve which account balances control our analysis.  Home Federal outsourced the collection of the credit card accounts to FDR. FDR's records did not accurately reflect the reversal of the $225 deposit Home

---

[4]Per Section 12.1 of the Agreement, the parties agree South Dakota law controls our analysis of the substantive issues in this matter.

[5]Section 3.4 of the Agreement provides:

If any payments, credits, or other consideration distributed or paid by or on behalf of Obligor on or after the Closing Date, Seller or Sellers' agent will be entitled to accept such payments.  Except as provided in 2.31.  If Seller or Sellers' agent receives such payments, credits, or other consideration after the Closing Date, Seller or Sellers' agent shall deliver such payments to Buyer within 45 days.

(Appellant's App. at 19.)

Federal effectuated prior to a secured account being charged-off. When CCDS was considering the purchase of the delinquent accounts, it was informed by FDR's account balances. Because of this, CCDS maintains that FDR's balances are the relevant balances. Home Federal, on the other hand, urges us to consider its internal records of the credit card accounts, which reflect the $225 credits being applied to the secured accounts prior to the sale of the accounts to CCDS. We agree with the district court that "[t]he important account information, as far as the cardholders, CCDS, and the Agreement were concerned, are the external balances found on the FDR system." (Dist. Ct. Op. at 8.) We next consider whether Home Federal's application of the security deposits to the secured accounts after their sale resulted in a breach of contract.

If Home Federal had collected security deposits at the time the secured accounts were opened, we would be inclined to agree with CCDS that it would be entitled to the full amount of those security deposits. In such a situation, Home Federal would be in a position to reimburse CCDS this amount because it would have already collected it from the cardholder. This situation would be much like a landlord returning a tenant's security deposit. This is not, however, the situation we are faced with here. As the district court aptly explained, Home Federal's advance of the $225 to the cardholder allowed the cardholder to purchase the $225 security interest over time. The $225 was charged to the credit card. When CCDS purchased the charged-off accounts, it purchased the right to collect the outstanding balances, including the $225 security deposits. The parties agreed, per the Agreement, that the value of the opportunity to collect the security deposits was $23,902.98. Because Home Federal credited $398,382.96 to the secured accounts, CCDS has been deprived of the value it paid for the right to collect. Home Federal has already compensated CCDS this amount, however. We agree with the district court that CCDS is not entitled to any damages. Therefore, its breach of contract claim must fail.

## 2. *Conversion*

For similar reasons, CCDS's conversion claim is also unsuccessful. South Dakota law defines conversion as the "unauthorized exercise of control or dominion over personal property in a way that repudiate's an owner's right in the property or in a manner inconsistent with such right." Chem-Age Indus., Inc. v. Glover, 652 N.W.2d 756, 766 (S.D. 2002). When Home Federal adjusted the account balances after the Agreement was signed, it did affect CCDS's ability to collect on the security deposits. Since it interfered with this ability, Home Federal is liable to CCDS for the fair market value of the property at the time of conversion. See Denke v. Mamola, 437 N.W.2d 205, 207 (S.D. 1989). We agree with the district court's determination that six cents on the dollar accurately reflects the fair market value of the accounts. Since CCDS has already received this amount ($23,902.98), it has already been compensated for its diminished ability to collect on the secured accounts' outstanding balances.

## B. Deceit and Mutual Mistake

### 1. *Deceit*

CCDS maintains that Home Federal was obligated to disclose Fullerton's fraudulent conduct while he was head of the credit card operation. Home Federal argues that it was not aware of any relevant misconduct at the time the Agreement became effective. According to the Restatement (Second) of Torts Section 551(2)(e),[6] in a business transaction, a party must disclose "facts basic to the transaction" when the party thinks the other transacting party is mistaken as to the facts, and a special relationship exists between the parties such that disclosure of the

---

[6]South Dakota applied the Restatement in Ducheneaux v. Miller, 488 N.W.2d 902, 913 (S.D. 1992).

facts would be reasonably expected. The district court held that Home Federal did not have a duty to disclose what it knew of Fullerton's actions because this information was not basic to the transaction.

We agree with the district court's conclusion. At issue is what information Home Federal was privy to prior to the transaction with CCDS, and then whether it was under an obligation to disclose this information to CCDS. Home Federal fired Fullerton on March 4th – shortly after the Agreement was signed by both parties. At that time, Home Federal was aware that Fullerton had increased his own credit line in violation of company policy. This fact is not essential to the charged-off debt CCDS purchased, as it does not relate to the credit card accounts.

CCDS maintains that at the time of the Agreement's consummation,[7] Home Federal was also aware that Fullerton had mismanaged the credit card operation and had been receiving kickbacks from marketing firms. CCDS, relying on Home Federal's claim to its bonding company, points out that Fullerton's mismanagement of the credit card operation began in mid-1998. This fact, taken in the light most favorable to CCDS, ultimately proves fatal to CCDS's deceit claim. CCDS purchased accounts charged-off prior to January 1, 1999. Home Federal did not charge-off an account until it was in arrears for 180 days, or six months. At best, this means the earliest possible origination date on an account sold to CCDS was June 1, 1998. CCDS has not shown that any of the accounts in CCDS's package were affected by Fullerton's mismanagement and it is unlikely that it could do so. See Chem-Age Indus., Inc., 652 N.W.2d at 765-66 (noting that fraud allegations require a higher

---

[7]The parties disagree as to when the Agreement became operative. The Agreement itself sets a closing date of February 23, 2004. CCDS signed the Agreement on March 2nd. CCDS did not obtain detailed account information from Home Federal until May 26, 1999. This latest date, May 26th, represents the consummation date according to CCDS. Our analysis , however, is not dependent on the consummation date and we therefore need not decide this issue.

level of specificity and granting summary judgment to defendant because plaintiff failed to produce specific evidence of fraud); Bruske v. Hill, 567 N.W.2d 872, 876 (S.D. 1997) (requiring specific facts to be proven in a deceit claim in order to survive a summary judgment motion).

CCDS argues that because it had the option to purchase future charged-off accounts, the "forward flow," under an amendment to the Agreement, Home Federal had an ongoing duty to disclose relevant information. CCDS did not purchase any forward flow and therefore cannot recover in a deceit action because it did not rely on Home Federal's potential misrepresentations. See Himrich v. Carpenter, 569 N.W.2d 568, 576 (S.D. 1997) ("An action for deceit requires proof that the misrepresentations were material to the formation of the contract and that the party relied on the misrepresentations to his detriment.").

Further, even if Fullerton had encouraged the expansion of the credit card operation beyond profitability, it is important to note that the accounts subject to the Agreement were – by definition – delinquent. The fact that Home Federal made unprofitable extensions of credit, at Fullerton's behest or not, was obvious due the nature of the transaction between CCDS and Home Federal. CCDS has not adduced any evidence indicating that Home Federal deceitfully withheld information basic to the transaction.

*2. Mutual Mistake*

CCDS argues that, as an alternative remedy, the entire Agreement should be rescinded on a mutual mistake theory. CCDS maintains the existence of the secured accounts fundamentally altered the nature of the deal between it and Home Federal. In order to allow a rescission of the Agreement because of a mutual mistake, we must be convinced that but for the inclusion of the secured accounts, CCDS would not have entered the arrangement. See Knudsen v. Jensen, 521 N.W.2d 415, 418 (S.D.

1994).  The security deposits accounted for only 5% of the total amount of the debt purchased by CCDS.  We agree with the district court that "[a]lthough CCDS may have refused to purchase that portion of the package that contained the secured accounts, there is no indication that CCDS would have refused to purchase the remaining charged-off debt from Home Federal." (Dist. Ct. Op. at 17.)  Accordingly, we deny CCDS's request to rescind the entire Agreement based on a mutual mistake.

## III.  Conclusion

Finding no genuine issue of material fact remaining for resolution at trial, we affirm the district court's grant of summary judgment in favor of Home Federal.

_____